UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CASE NO.

**FILED**

**JUL 1 9 2001**

ADA L. RON-MESSER, P.O. Box 6707
Falls Church, VA
22040-6706

    Plaintiff,

vs.

JANET RENO; STANLEY MARCUS; WILLIAM CLINTON; HILLARY CLINTON; MADELAINE ALBRIGHT; LOUIS FREEH; JAMES CARTER; RONALD REAGAN; GEORGE BUSH; GEORGE W. BUSH; JOHN ASHCROFT; COLIN POWELL; OTTO REICH; THE UNITED STATES OF AMERICA; JOHN DOES I; JOHN DOES II; JOHN DOES III; KENNETH STARR; ROBERT RAY; BRUCE UDOLF; JESSIE HELMS; ROBERT GRAHAM; ROBERT TORRICELLI; NEWTON GINGRICH; HENRY HYDE; DONALD BURTON; ILEANA ROS-LEHTINEN; LINCOLN DIAZ-BALALRT; YVONE CEDENO; JAMES L. KING; NORMAN ROETTGER; LINNEA JOHNSON; URSULA UNGARO-BENAGES; DONALD GRAHAM; MICHAEL K. MOORE; WILLIAM TURNOFF; LENORE NESBITT; JOAN LENARD; BARRY GARBER; WILLIAM ZLOCH; EDWARD DAVIS; ROSEMARY BARKETT; SUSAN BLACK; STATE OF FLORIDA; JOSEPH FARINA; ROBBIE BARR; JERRY COHEN; ELLEN VENZER; JEFFREY SWARTZ; NANCY POLLOCK; KATHERINE RUNDLE; JONHETTE HARDIMAN; SAMANTHA DORSEY; BENNETH BRUMMER; PATRICK NALLY; BRIAN TANNEBAUM; COUNTY OF DADE; ALEX PENELAS; MERRET STIERHEIM; ROBERT GINSBURG; LEE KRAFTCHICK; WILLIAM CANDELA; ROBERT DAVIES; FRED TAYLOR; CARLOS ALVAREZ; LAZARO PEREZ; F. GUERRERO; JOHN DOLAN; DORIS HERRERA; ALEJANDRO RODRIGUEZ; DANIEL LLANO; ALEJANDRO CELAYA; JOAQUIN AVINO; ARMANDO MORCATE; JUAN DE ONA; FRED CRAWFORD; LONNIE LAWRENCE; KEVIN HICKEY; JOSE TORANO; FRANCIS BROPHY; RICARDO ORTEGA; GERALD JONES; HARRIET HART; JOHN BARLI; CHRISTOPHER CAPUTO; STEPHEN ROSENBAUM; RODOLFO PEREZ; GEORGE SPOFFORD; CITY OF MIAMI; DONALD WARSHAW; JOHN BUHMASTER; GEORGE CADAVID; RODRIGO LLANES; ANTONIO PIULATS; RICARDO CHAVEZ; CALVIN ROSS; ROBERT CHEATHAM; ANTONIO MESA; CELESTINO PERERA; SOUTHERN BELL; REPUBLIC NATIONAL BANK; BARNETT BANK TRUST CO., N.A.; KISLAK MORTGAGE CORPORATION; JAY I. KISLAK; NANCY ROSE;

CASE NUMBER  1:01CV01669

JUDGE: Thomas Penfield Jackson

DECK TYPE: Civil Rights (non-employment

DATE STAMP: 0?/19/2001

    Defendants.                /

## COMPLAINT

    Plaintiff,  ADA L. RON-MESSER, sues Defendants JANET RENO,

individually and as former State Attorney for the Eleventh Judicial Circuit of Florida and former United States Attorney General; STANLEY MARCUS, individually and as former United States District Attorney for the Southern District of Florida, former United States District Judge for same District and present United States Circuit Judge for the Eleventh Circuit; WILLIAM CLINTON, individually and as former President of the United States; HILLARY CLINTON, individually, as former First Lady and as present member of the Senate of the United States; MADELINE ALBRIGHT, individually and as former Secretary of State of the United States; LOUIS FREEH, individually and as former Director of the Federal Bureau of Investigations; JAMES CARTER, individually and as former President of the United States; RONALD REAGAN, individually and as former President of the United States; GEORGE BUSH, individually and as former President of the United States; GEORGE W. BUSH, as President of the United States in his official capacity only; JOHN ASHCROFT, as Attorney General of the United States in his official capacity only; COLIN POWELL, as Secretary of State of the United States in his official capacity only; OTTO REICH, as Assistant Secretary of State in his official capacity only; THE UNITED STATES OF AMERICA; JOHN DOES I, individually and as former and present agents and employees of the Central Intelligence Agency of the United States whose names are fictitious being presently unknown to Plaintiff; JOHN DOES II, individually and as former and present agents and employees of the Federal Bureau of Investigations whose names are fictitious being presently unknown

to Plaintiff; JOHN DOES III, individually and as former and present officials and employees of the State of New York and/or the State of New Jersey whose names are fictitious being presently unknown to Plaintiff; KENNETH STARR, individually and as former Independent Counsel of the United States; ROBERT RAY, individually and as present Independent Counsel of the United States; BRUCE UDOLF, individually and as Chief United States Attorney for Public Corruption for the Southern District of Florida; JESSIE HELMS, individually and as member of the Senate of the United States; ROBERT GRAHAM, individually and as member of the Senate of the United States; ROBERT TORRICELLI, individually and as member of the House of Representatives of the United States; NEWTON GINGRICH, individually and as former Speaker of the House of Representatives of the United States; HENRY HYDE, individually and as member of the House of Representatives of the United States; DONALD BURTON, individually and as member of the House of Representatives of the United States; ILEANA ROS-LEHTINEN, individually and as member of the House of Representatives of the United States; LINCOLN DIAZ BALART, individually and as member of the House of Representatives of the United States; YVONE CEDENO, individually and as Supervisor of the Intake Section of the United States District Court for the Southern District of Florida; JAMES L. KING, individually and as United States District Judge for the Southern District of Florida; NORMAN ROETTGER, individually and as United States District Judge for the Southern District of Florida; LINNEA JOHNSON, individually and as United States

Magistrate for the Southern District of Florida; URSULA UNGARO-BENAGES, individually and as United States District Judge for the Southern District of Florida; DONALD GRAHAM, individually and as United States District Judge for the Southern District of Florida; MICHAEL K. MOORE, individually and as United States District Judge for the Southern District of Florida; WILLIAM TURNOFF, individually and as United States Magistrate for the Southern District of Florida; LENORE NESBITT, individually and as United States District Judge for the Southern District of Florida; JOAN LENARD, individually and as United States District Judge for the Southern District of Florida; BARRY GARBER, individually and as United States Magistrate for the Southern District of Florida; WILLIAM ZLOCH, individually and as Chief Judge of the United States District Court for the Southern District of Florida; EDWARD DAVIS, individually and as former Chief Judge of the United States District Court for the Southern District of Florida; ROSEMARY BARKETT, individually and as United States Circuit Judge for the Eleventh Circuit; SUSAN BLACK, individually and as United States Circuit Judge for the Eleventh Circuit; STATE OF FLORIDA; JOSEPH FARINA, individually and as Chief Judge for the Eleventh Judicial Circuit of Florida; ROBBIE BARR, individually and as Circuit Judge for the Eleventh Judicial Circuit of Florida; JERRY COHEN, individually and as County Judge for the Eleventh Judicial Circuit of Florida; ELLEN VENZER, individually and as County Judge for the Eleventh Judicial Circuit of Florida; JEFFREY SWARTZ, individually and as County Judge for the Eleventh Judicial Circuit of Florida;

NANCY POLLOCK, individually and as County Judge for the Eleventh Judicial Circuit of Florida; KATHERINE RUNDLE, individually and as State Attorney for the Eleventh Judicial Circuit of Florida; JONHETTE HARDIMAN, individually and as Assistant State Attorney for the Eleventh Judicial Circuit of Florida; SAMANTHA DORSEY, individually and as Assistant State Attorney for the Eleventh Judicial Circuit of Florida; BENNETH BRUMMER, individually and as Public Defender for the Eleventh Judicial Circuit; PATRICK NALLY, individually and as Public Defender for the Eleventh Judicial Circuit; BRIAN TANNEBAUM, individually and as Public Defender for the Eleventh Judicial Circuit; COUNTY OF MIAMI-DADE; ALEX PENELAS, individually and as Mayor for the County of Miami-Dade; MERRET STIERHEIM, individually and as Manager for the County of Miami-Dade; ROBERT GINSBURG, individually and as Attorney for the County of Miami-Dade; LEE KRAFTCHICK, individually and as Assistant Attorney for the County of Miami-Dade; WILLIAM CANDELA, individually and as Assistant Attorney for County of Miami-Dade; ROBERT DAVIES, individually and as Assistant Attorney for the County of Miami-Dade; FRED TAYLOR, individually and as former Sheriff for the County of Miami-Dade; CARLOS ALVAREZ, individually and as present Sheriff for the County of Miami-Dade; LAZARO PEREZ, individually and as Police Officer for the County of Miami-Dade; F. GUERRERO, individually and as Police Officer for the County of Miami-Dade; JOHN DOLAN, individually and as Corporal of Police for the County of Miami-Dade; DORIS HERRERA, individually and as Detective for the County of Miami-Dade; ALEJANDRO RODRIGUEZ, individually

-5-

and as Police Officer for the County of Miami-Dade; DANIEL LLANO, individually and as Sergeant of Police for the County of Miami-Dade; ALEJANDRO CELAYA, individually and as Police Officer for the County of Miami-Dade; JOAQUIN AVINO, individually and as former Manager for the County of Miami-Dade; ARMANDO MORCATE, individually and as former Supervisor of Human Resources for the County of Miami-Dade; JUAN DE ONA, individually and as Affirmative Action Specialist for the County of Miami-Dade; FRED CRAWFORD, individually and as former Director of Corrections and Rehabilitations for the County Miami-Dade; LONNIE LAWRENCE, individually and as former Director of Corrections and Rehab. for the County of Miami-Dade; KEVIN HICKEY, individually and as former Deputy Director of Corrections and Rehabilitations for the County of Miami-Dade; JOSE TORANO, individually and as former Director of Administration of Corrections and Rehab. for the County of Miami-Dade; FRANCIS BROPHY, individually and as former Assistant Director of Administration of Corrections and Rehabilitations for the County of Miami-Dade; RICARDO ORTEGA, individually and as Supervisor of Administration of Corrections and Rehabilitations for the County of Miami-Dade; GERALD JONES, individually and as Supervisor of Support Services of Corrections and Rehabilitations for the County of Miami-Dade; HARRIET HART, individually and as former Supervisor of Support Services of Corrections and Rehabilitations for the County of Miami-Dade; JOHN BARLI, individually and as former Chief Accountant of Housing and Urban Development for the County of Miami-Dade; CHRISTOPHER CAPUTO, individually and as former Director of

-6-

## PRELIMINARY STATEMENT

1. This is an action against the United States of America under Title 28 U.S.C. §§2671 et seq., and 1346(b), Federal Tort Claims Act, for money damages for the personal injuries, and the injury and loss of property caused by the tortious acts and omissions of Defendants STANLEY MARCUS, JANET RENO, RONALD REAGAN, GEORGE BUSH, JAMES CARTER, WILLIAM CLINTON, LOUIS FREEH, MADELINE ALBRIGHT, JOHN DOES I, JOHN DOES II, JOHN DOES III, KENNETH STARR, ROBERT RAY, BRUCE UDOLF, JESSIE HELMS, ROBERT GRAHAM, ROBERT TORRICELLI, NEWTON GINGRICH, HENRY HYDE, DONALD BURTON, ILEANA ROS-LEHTINEN, LINCOLN DIAZ-BALART, YVONE CEDENO, JAMES L. KING, NORMAN ROETTGER, LINNEA JOHNSON, URSULA UNGARO-BENAGES, DONALD GRAHAM, MICHAEL K. MOORE, WILLIAM TURNOFF, LENORE NESBITT, JOAN LENARD, BARRY GARBER, WILLIAM ZLOCH, EDWARD DAVIS, ROSEMARY BARKETT and SUSAN BLACK. The Defendants are former or present officers or employees of federal agencies of the executive, judicial or legislative branches of the government of the United States within the meaning of §2671, and were acting within the scope of their offices or employments. The complaint alleges intentional infliction of severe emotional and mental distress, invasion of privacy, trespass and civil conspiracy to deprive Plaintiff of her rights secured to all Americans under the Constitution of the United States. The Defendants have acted so far beyond the scope of their authority that they could not have been exercising a function which could be called discretionary.

-9-

2. Pursuant to Title 28 U.S.C. §2679(b)(2), provisions of §2679(b)(1) that remedy provided by §§2672 and 1346(b) is exclusive to any other civil action do not extend to apply to civil actions against an officer or employee of the government of the United States: (A) which is brought for violations of the Constitution of the United States, or (B) which is brought for violation of a statute of the United States under which such action against the individual is otherwise authorized. Accordingly, the complaint seeks actual and punitive damages pursuant to the holding in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d. 619, against Defendants STANLEY MARCUS, JANET RENO, RONALD REAGAN, GEORGE BUSH, JAMES CARTER, WILLIAM CLINTON, LOUIS FREEH, HILLARY CLINTON, MADELINE ALBRIGHT, JOHN DOES I, JOHN DOES II, JOHN DOES III, KENNETH STARR, ROBERT RAY, BRUCE UDOLF, JESSIE HELMS, ROBERT GRAHAM, ROBERT TORRICELLI, NEWTON GINGRICH, HENRY HYDE, DONALD BURTON, ILEANA ROS-LEHTINEN, LINCOLN DIAZ-BALART, YVONE CEDENO, JAMES KING, NORMAN ROETTGER, LINNEA JOHNSON URSULA UNGARO-BENAGES, DONALD GRAHAM, MICHAEL K. MOORE, WILLIAM TURNOFF, LENORE NESBITT, JOAN LENARD, BARRY GARBER, WILLIAM ZLOCH, EDWARD DAVIS, ROSEMARY BARKETT and SUSAN BLACK, for violation of a) Plaintiff's rights protected under the First Amendment to the Constitution of the United States to freedom of speech, communication and association; b) Plaintiff's rights under the Fourth Amendment to the Constitution of the United States to be secure in her person, house, papers and effects against unreasonable searches and seizures, c) Plaintiff's rights

protected under the Fifth Amendment to the Constitution of the United States to pursue a profession, to acquire, enjoy and alienate property and  to the due process of the laws, and d) Plaintiff's rights under the Eighth Amendment to the Constitution of the United States to be free from cruel and unusual punishment.

3. The complaint seeks actual, liquidated and punitive damages pursuant to Title 50 U.S.C. §§1810 and 1828 against Defendants STANLEY MARCUS, JANET RENO, LOUIS FREEH, RONALD REAGAN, GEORGE BUSH, WILLIAM CLINTON, JOHN DOES I, JOHN DOES II, AND JOHN DOES III for making or conspiring to make Plaintiff, who is not a foreign power or an agent of a foreign power as defined in section 1801 (a) or (b)(1)(A), but is a United States person as defined in section 1801(i), and Plaintiff's premises the target of electronic surveillance and physical searches and seizures, not for the purpose of obtaining foreign intelligence information, but for the purpose of inflict on Plaintiff cruel and unusual punishment and severe emotional and mental distress by infiltrating, disrupting and terminating her private relations, by appropriating and destroying her real and personal property, by appropriating and destroying her personal papers and effects, including her pictures, and by appropriating and destroying her legal papers in pursuance of the conspiracy to impede, prevent, deter or delay her from attending the courts of the United States to petition for redress of her grievances against the government.

-11-

4.   The complaint invokes the mandamus jurisdiction of the court under Title 28 U.S.C. §§1361 and 1651 to obtain a preliminary and permanent injunction preventing further violations of Plaintiff's rights secured under the laws and the Constitution of the United States by Defendants STANLEY MARCUS, JANET RENO, LOUIS FREEH, KATHERINE RUNDLE, JOHN DOES I, JOHN DOES II and JOHN DOES III, who arbitrarily, capriciously and stubbornly, in excess of their authority, or exercising an authority that is unconstitutional or is being exercised in unconstitutional manner, have conspired with other officials of the United States, the States of Florida and New York, the County of Miami-Dade, the City of Miami, and with private persons to make the Plaintiff, a citizen of the United States, and Plaintiff's premises, the target of electronic surveillance and physical searches and seizures under Title 50 U.S.C. §§1801 et seq., and §§1821 et seq., and to undertake the unreasonable surveillance activities in conjunction with other unlawful activities of wrongful blacklisting, braking and entering, mail tampering, dissemination in derogatory manner of unlawfully obtained information, harassment, intimidation and threats, disruption of personal associations and activities, willful injury or destruction of property, papers and effects, restrictions of employment opportunities and infringement of right to petition for redress of grievances against Dade Officials, and a declaration that the Defendants' activities deprive Plaintiff of the rights under U.S. Constitutional Amendments 1, 4, 5, 8 and 14, and have been authorized and

-12-

undertaken with the malicious intent to cause the deprivation of Plaintiff's civil and constitutional rights and the personal injuries and loss of property that Plaintiff has sustained.

5. The complaint invokes the mandamus jurisdiction of the court under Title 28 U.S.C. §1361 and 1651 to obtain a writ of mandamus and prohibition refraining Defendants STANLEY MARCUS, JANET RENO, KATHERINE RUNDLE, LOUIS FREEH, WILLIAM CLINTON, HILLARY CLINTON, MADELINE ALBRIGHT, JOHN DOES I, JOHN DOES II, JOHN DOES III, KENNETH STARR, ROBERT RAY, BRUCE UDOLF, JESSIE HELMS, ROBERT GRAHAM, ROBERT TORRICELLI, NEWTON GINGRICH, HENRY HYDE, DONALD BURTON, ILEANA ROS-LEHTINEN, LINCOLN DIAZ-BALART, YVONE CEDENO, JAMES L. KING, NORMAN ROETTGER, LINNEA JOHNSON, URSULA UNGARO-BENAGES, DONALD GRAHAM, MICHAEL K. MOORE, WILLIAM TURNOFF, LENORE NESBITT, JOAN LENARD, BARRY GARBER, WILLIAM ZLOCH, EDWARD DAVIS, ROSEMARY BARKETT and SUSAN BLACK, whose actions amount to usurpation of power and are contrary to law, going beyond permissible discretion, from assuming jurisdiction of any matter brought before the courts by Plaintiff, from taking further action or engaging in further conspiratorial activities aimed at denying to Plaintiff the right to an equal, meaningful, effective and adequate access to the courts of the United States, or from further engaging in wrongful dissemination of misleading information affecting Plaintiff's cause of action.

6. The complaint invokes the mandamus jurisdiction of the court under Title 28 U.S.C. §1361 and 1651 to obtain a writ of mandamus compelling Defendants GEORGE W. BUSH and JOHN ASHCROFT to discharge the duties of their offices to protect,

-13-

defend and preserve the Constitution of the United States preventing further violations of Plaintiff's rights under U.S. Constitutional Amendments 1, 4, 5, and 8, by immediately ceasing and desisting from treating the Plaintiff, a United States person within the meaning of §1801(i), as a foreign power or an agent of a foreign power, by immediately ceasing and desisting from authorizing, or applying for a court order authorizing to make Plaintiff, or Plaintiff's premises, the target of electronic surveillance or physical searches and seizures pursuant to Title 50 U.S.C. §§1801, et seq., or 1821, et seq., and declaring that the Administrations of Defendants Reagan, Bush and Clinton have intentionally, wantonly, callously, deliberately and outrageously deprived Plaintiff of the rights secured to all American citizens under the Constitution of the United States, as well as the basic human rights and fundamental freedoms guaranteed to all persons by the United Nations Charter.

7. The complaint challenges the constitutionality of the Foreign Intelligence Surveillance Act of 1978, and 1994, Title 50 U.D.C. §§1801, et seq., and 1821, et seq., and Excutive Orders Nos. 12139 and 12949 as applied to Plaintiff mother, Ana Messer, and as applied to Plaintiff, by making Plaintiff's premises the target of permanent electronic and video surveillance. The complaint challenges the constitutionality of the statute in general which vests the President and Attorney General of the United States with the power, unilaterally exercised, to make a person the target of electronic surveillance and physical searches and seizures based upon the Attorney General's arbitrary

-14-

determination that the target meets the definition of foreign power or agent of foreign power under Title 50 U.S.C. §1801.

8. The complaint challenges the constitutionality of New York Statutes Article 18, §18.18 drawn in its entirety from Article 77, being silent regarding the procedures to be followed in ancillary proceedings other than to indicate that the appointment of a guardian in New York for a person not present in the State of New York, who has been determined in another jurisdiction to require a guardian, is governed by the discretion of the court, is so vague that it violates the fair notice requirements of due process guaranteed by U.S. Constitutional Amendment 14. The complaint challenges the constitutionality of similar New Jersey Statutes 3B:12. The complaint requests an injunction against further enforcement of the statutes and a declaration that the enforcement has violated Plaintiff's civil and constitutional rights.

9. The complaint invokes the mandamus jurisdiction of the court under Title 28 U.S.C. §§1361 and 1651 to enjoin the Defendants GEORGE W. BUSH, COLIN POWELL and OTTO REICH from transferring any control of the Plaintiff's person, property or legal rights to THE REPUBLIC OF CUBA, or any official or agency thereon, for the purpose of justifying the treatment of the Plaintiff as a foreign power or an agent of a foreign power pursuant to Title 50 U.S.C. §1801(i) and to continue to deprive Plaintiff of her rights under U.S. Constitutional Amendments 1, 4, 5, 8 and 14, as well as her rights under the United Nations Charter by circuitous and indirect methods.

-15-

10. The complaint seeks damages and injunctive relief against the Defendants REPUBLIC OF CUBA, CUBAN POPULAR TRIBUNAL, FIDEL CASTRO, RICARDO ALARCON, ROBERTO ROBAINA and FELIPE PEREZ ROQUE pursuant to Title 28 U.S.C. §§1330, 1331, 1603, 1605(a)(1), (4) and (5) for personal injuries and loss of property occurring in the United States and caused by the tortious acts and omissions of the REPUBLIC OF CUBA, its instrumentalities and its officials.

11. The complaint seeks damages, and injunctive and declaratory relief against the REPUBLIC OF CUBA, CUBAN POPULAR TRIBUNAL, FIDEL CASTRO, RICARDO ALARCON, ROBERTO ROBAINA and FELIPE PEREZ ROQUE pursuant to Title 28 U.S.C. §§1350 for injuries to Plaintiff resulting from the Defendants' tortious acts under color of government authority in violation of the law of nations, acting as agents of JOHN DOES I.

12. The complaint seeks relief from the orders entered in Case No. 90-0230 by Defendant URSULA UNGARO-BENAGES for fraud upon the court pursuant to the "Savings Clause" of Rule 60(b), Federal Rules of Civil Procedure.

13. The complaint seeks relief from the orders entered in Case No. 92-1569 by Defendant MICHAEL K. MOORE for fraud upon the court pursuant to the "Savings Clause" of Rule 60(b), Federal Rules of Civil Procedure.

14. The complaint seeks relief from the orders entered in Case No. 99-1618 by Defendant WILLIAM ZLOCH for fraud upon the court pursuant to the "Savings Clause" of Rule 60(b), Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

1. Pursuant to Title 28 U.S.C. §1346(b), this court has exclusive jurisdiction of this civil action under the Federal Tort Claims Act, Title 28 U.S.C. §2671, et. seq., against the United States for money damages accruing on and after January 1, 1945, for personal injuries and injuries and loss of property caused by the tortious acts or omissions of the Defendants, employees or officers of the Government of the United States, while acting with the scope of their offices or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the state where the act or omission occurred. Venue in this district is proper under Title 28 U.S.C. §1391(1).

2. The United States District Court for the District of Columbia has jurisdiction Plaintiff's action against the REPUBLIC OF CUBA and Cuban instrumentalities and officials under Title 28 U.S.C. §§1330(a), (b), 1331, and 1350; and venue under Title 28 U.S.C. §1391(f)(4).

3. Pursuant to Title 18 U.S.C. §1964 this court has jurisdiction of Plaintiff's claims for threefold damages for the injuries to her business and properties by reason of the Defendants' pattern of racketeering activity in violation of §1962 of the same title.

4. The complaint raised a claim arising under the Constitution and laws of the United States, specifically 42 U.S.C. §§1983 and 1985(1), (2) and (3): (a) to redress deprivation, under color of state law and state action, of

Plaintiff's rights, privileges and immunities secured by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States; (b) To recover damages for the deprivation of Plaintiff's rights and privileges as citizen of the United States by Defendants' acts in furtherance of a conspiracy prohibited under 42 U.S.C. §1985; and (c) to recover damages for the injury to her person and property by reason of the Defendants' acts in furtherance of a conspiracy prohibited under 42 U.S.C. §1985. This court possesses subject matter jurisdiction under 28 U.S.C. §§1331 and 1343(a)(1), (2) and (3), and venue in this district is proper under 28 U.S.C. §1391(b)(1) and (2). Federal Officials are subjected to liability under the civil rights conspiracy statute, Title 42 U.S.C. §1985. Under color of state law and state action is not needed for jurisdiction invoked under Title 28 U.S.C. §1343(a)(1) for acts in violation of Title 42 U.S.C. §1985(3) that deprived Plaintiff if rights on account of her sex and her ethnicity. To act under color of state law or state action required by Title 42 U.S.C. §§1983 and 1985(2) does not require that Defendant by an officer of the state, it is enough that Defendant is a willful participant in joint action with the state or its agents. Joint conspiracy between federal officials and state officials or between private parties and state officials that deprive Plaintiff of rights secured under the Constitution of the United states satisfy the under color of state law or state action of Title 42 U.S.C. §§1983 and 1985(2).

5. Pursuant to Title 28 U.S.C. §1367(a), this court shall

have supplemental jurisdiction over all other claims that are so related to claims in the action within its original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution, including claims that involve the joinder or intervention of additional parties.

## DEMAND FOR JURY TRIAL

1. Plaintiff demands a trial by jury of her legal claims under Bivens and Title 42 U.S.C. §§1983 and 1985, as well as her claims under Title 18 U.S.C. §1964. Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff's right to jury trial is within the ambits of the Seventh Amendment to the United States Constitution.

## PETITION FOR THREE JUDGES

1. Pursuant to Title 28 U.S.C. §§2281 and 2284 a court of three judges shall be convened when the complaint challenges the compatibility of an Act of Congress, Title 50 U.S.C. §§1801, et seq., and 1821, et seq., with U.S. Constitutional Amendments 1, 4 and 5, and attacks, under equal protection clause of U.S. Constitutional Amendment 14, New York and New Jersey statutes. A three-Judge court shall be convened pursuant to 28 U.S.C. §2281 whenever the constitutionality of a State statute as a whole or as applied to the Plaintiff is challenged in the complaint and an interlocutory or permanent injunction restraining its enforcement, execution or application is sought.

PARTIES

1. Plaintiff, ADA L. RON-MESSER ("Ron-Messer") is a Hispanic female of Cuban national origin. Ron-Messer naturalized citizen of the United States in June 1985. Ron-Messer was employed by the County of Miami-Dade between January 3, 1983, and June 12, 1989. Ron-Messer is the Plaintiff to Case Nos. 89-2864 and 90-0230 brought in the United States District Court for the Southern District of Florida on December 26, 1989, and January 24, 1990, respectively. Ron-Messer is the Plaintiff to Case No. 92-1569 brought in the United States District Court for the Southern District of Florida on July 2, 1992. Ron-Messer is the Plaintiff to Cases Nos. 95-2368, 96-2585, 98-0087, 98-2517 and 99-1618 that Ron-Messer filed or intended to file in the United States District Court for the Southern District of Florida on September 10, 1996, January 14, and October 27, 1998 and June 10, 1999, respectively. Ron-Messer is the Defendant in Case No. 94-20188 brought by Barnett Bank Trust Co., N.A., in the Circuit Court for the Eleventh Judicial Circuit of Florida on October 28, 1994. Ron-Messer is the Defendant to a prosecution brought by the State of Florida, Case No. M96-8739, on February 26, 1996. Ron-Messer is the Defendant to Case Nos. 97-4231-CC25, 98-942 CC05 and 99-12306-CC05 brought in the County Court for the Eleventh Judicial Circuit of Florida on June 10, 1997, on January 20, 1998, and on September 24, 1999, by Basilio Sifko, by Miriam Blanco and by Jose Garcia, respectively. Case No. 98-942 was removed to the United States District Court for the Southern District of Florida, Case No. 98-1425.

2.   Defendant JANET RENO ("Reno") was the State Attorney for the Eleventh Judicial Circuit of Florida between 1978 and 1993, that was appointed United States Attorney General by Clinton. Reno was named as Defendant to Case No. 89-2864.

3. Defendant STANLEY MARCUS ("Marcus") was appointed United States District Attorney for the Southern District of Florida by Reagan in 1982, was appointed United States District Judge for same District by Reagan in August 1985, and was elevated to United States Circuit Judge for the Eleventh Circuit in 1997 by Clinton. Marcus was assigned Case No. 89-2864 in December 1989, Case No. 90-0230 in September 1990, and Case No. 95-2368 in October 1995. Marcus reassigned Case No. 90-0230 to Ungaro-Benages in November 1992, and Case No. 95-2368 in November 1995. Marcus proceeded from the State of New York.

4.   Defendant WILLIAM CLINTON ("Clinton") was the President of the United States from January 1993 to January 2001.

5.   Defendant HILLARY CLINTON ("Hillary") former First Lady was elected for Senate of the United States from the State of New York in November 2000.

6.   Defendant LOUIS FREEH ("Freeh") was appointed Director of the Federal Bureau of Investigations ("FBI") by Reno and Clinton in April 1993.

7.   Defendant MADELINE ALBRIGHT ("Albright") was appointed Secretary of State of the United States by Clinton in 1996.

8.   Defendant JAMES CARTER ("Carter") was the President of the United States from January 1976 to January 1980.

9.  Defendant RONALD REAGAN ("Reagan") was the President of the United States from January 1981 to January 1989.

10.  Defendant GEORGE BUSH ("Bush") was the President of the United States from January 1898 to January 1993.

11.  Defendant GEORGE W. BUSH ("G.W.Bush") is the President of the United States since January 21, 2001.

12.  Defendant JOHN ASHCROFT ("Ashcroft") is the Attorney General of the United States and was so appointed by G.W. Bush.

13. Defendant COLIN POWELL ("Powell") was appointed Secretary of State of the United States by G.W. Bush in January 2001.

14.  Defendant OTTO REICH ("Reich") was appointed Assistant Secretary of State for Western Hemispheric Affairs by G.W. Bush.

15.  Defendant UNITED STATES OF AMERICA ("United States").

16.  Defendants JOHN DOES I ("John Does I") are the former and present agents and employees of the Central Intelligence Agency ("CIA") of the United States whose names are fictitious being presently unknown to Plaintiff and whose actions caused or contributed to cause Plaintiff's injuries.

17.  Defendants JOHN DOES II ("John Does II") are the former and present agents and employees of the FBI whose names are fictitious being presently unknown to Plaintiff and whose actions caused or contributed to cause Plaintiff's injuries.

18.  Defendants JOHN DOES III ("John Does III") are the former and present officials and employees of the State of New York and/or the State of New Jersey whose names are fictitious being presently unknown to Plaintiff and whose actions caused or contributed to cause Plaintiff's injuries.

19. Defendant KENNETH STARR ("Starr") was appointed Independent Counsel of the United States in 1994 to conduct the Whitewater grand jury investigation. Starr was authorized by Reno to expand the probe in January 1998, to investigate whether President Clinton had a sexual affair with Monica Lewinsky.

20. Defendant ROBERT RAY ("Ray") was appointed Independent Counsel of the United States to take over the Whitewater investigation in or about October 1999.

21. Defendant BRUCE UDOLF ("Udolf") was the Chief United States Attorney for Public Corruption for the Southern District of Florida that leaded the Greenpalm Operation in 1995. Was appointed to join Starr's team in or about July 1997.

22. Defendant JESSIE HELMS ("Helms") is member of the Senate of the United States. Helms introduced the Helms-Burton Act signed by Clinton in February 1995.

23. Defendant ROBERT GRAHAM ("Graham") is member of the Senate of the United States.

24. Defendant ROBERT TORRICELLI ("Torricelli") is member of the House of Representatives of the United States.

25. Defendant NEWTON GINGRICH ("Gingrich") was the Speaker of the House of Representatives of the United States until his retirement or resignation in or about November 1998.

26. Defendant HENRY HYDE ("Hyde") is member of the House of Representatives of the United States. Hyde was the Chairman of the Judiciary Committee of the House throughout the process of impeachment of President Clinton.

-28-

27. Defendant DONALD BURTON ("Burton") is member of the House of Representatives of the United States.

28. Defendant ILEANA ROS-LEHTINEN ("Ros-Lehiten") is member of the House of Representatives of the United States.

29. Defendant LINCOLN DIAZ-BALART ("Diaz-Balart") is member of the House of Representatives of the United States.

30. Defendant YVONE CEDENO ("Cedeno") is the Supervisor of the Intake Section of the United States District Court for the Southern District of Florida and was so appointed in 1983.

31. Defendant JAMES L. KING ("King") is a United States District Judge for the Southern District of Florida. King was Chief Judge of the Court from 1983 to 1991.

32. Defendant NORMAN ROETTGER ("Roettger") is a United States District Judge for the Southern District of Florida. Roettger was Chief Judge of the Court from 1991 to 1997.

33. Defendant LINNEA JOHNSON ("Johnson") is a United States Magistrate for the Southern District of Florida, Johnson was assigned Cases Nos. 89-2864 and 90-0230 to conduct the discovery process. Johnson was asssigned Case No. 98-0087.

34. Defendant URSULA UNGARO-BENAGES ("Ungaro-Benages") is a United States District Judge for the Southern District of Florida and was so appointed in November 1992. Ungaro-Benages was assigned Case No. 90-0230 on November 25, 1992, and Case No. 95-2368 on November 1, 1995. Ungaro-Benages was a Circuit Judge for the Eleventh Judicial Circuit of Florida prior to her elevation to the federal bench.

35. Defendant DONALD GRAHAM ("Graham") is a United States

District Judge for the Southern District of Florida and was so appointed on October 4, 1991. On October 5, 1991, the voting rights suit that was pending before the court brough by a group of leaders of the Hispanic and Black communities was reassigned to Graham. Case No. 98-2517 was assigned to Graham.

36. Defendant MICHAEL K. MOORE ("Moore") is a United States District Judge for the Southern District of Florida. Moore was appointed to the bench by Bush in 1992. Moore was assigned Case No. 92-1569.

37. Defendant WILLIAM TURNOFF ("Turnoff") is a United States Magistrate for the Southern District of Florida. Turnoff was assigned Case No. 92-1569.

39. Defendant LENORE NESBITT ("Nesbitt") is a United States District Judge for the Southern District of Florida. Nesbitt's husband, Jopseph Nesbitt, is a District Judge for the Third District Court of Appeals of Florida.

30. Defendant JOAN LENARD ("Lenard") is a United States District Judge for the Southern District of Florida. Lenard was a Circuit Judge for the Eleventh Judicial Circuit of Florida prior to her elevation to the federal bench by Clinton in 1996.

40. Defendant BARRY GARBER ("Garber") is a United States Magistrate for the Southern District of Florida. Garber was assigned Case No. 98-1425 removed by Cedeno from the county court for the Eleventh Judicial Circuit of Florida to the United States District Court for the Southern District of Florida on or about June 1, 1998.

41. Defendant WILLIAM ZLOCH ("Zloch") is the Chief Judge

of the United States District Court for the Southern District of Florida and was so appointed in July 2000 after Davis retirement. Zloch was appointed to the bench by Reagan.

42. Defendant EDWARD DAVIS ("Davis") was the Chief Judge of the United States District Court for the Southern District of Florida from 1997 to 2000. Davis was appointed to the bench by Carter.

43. Defendant ROSEMARY BARKETT ("Barkett") is a United States Circuit Judge for the Eleventh Circuit Court of Appeals and was so appointed by Clinton in 1994. Prior to her elevation to the federal bench, Barkett, personal friend of Reno, was the Chief Judge of the Supreme Court of Florida.

44. Defendant SUSAN BLACK ("Black") is a United States Circuit Judge for the Eleventh Circuit Court of Appeals. Prior to her elevation to the federal bench, Black was a Circuit Court of the state court for the Duval County, Florida.

45. Defendant STATE OF FLORIDA ("Florida") is Plaintiff in prosecution against Ron-Messer, Case No. M96-8739.

46. Defendant JOSEPH FARINA ("Farina") is the Chief Judge of the County and Circuit Courts for the Eleventh Judicial Circuit of Florida and was so appointed in March 1995.

47. Defendant ROBBIE BARR ("Barr") is a Circuit Judge for the Eleventh Judicial Circuit of Florida. Barr was assigned Case No. 94-20188.

48. Defendant JERRY COHEN ("Cohen") is a County Judge for the Eleventh Judicial Circuit of Florida. Cohen was assigned Case No. M96-8739.

-31-

49. Defendant ELLEN VENZER ("Venzer") is a County Judge for the Eleventh Judicial Circuit of Florida. Venzer was reassigned Case No. M96-8739 in or about April 1996.

50. Defendant JEFFREY SWARTZ ("Swartz") is a County Judge for the Eleventh Judicial Circuit of Florida. Swartz was assigned Case No. 97-4231-CC25.

51. Defendant NANCY POLLOCK ("Pollock") is a County Judge for the Eleventh Judicial Circuit of Florida. Pollock was assigned Case No. 98-942-CC07, and Case No. 99-12306-CC05.

52. Defendant KATHERINE RUNDLE ("Rundle") is the State Attorney for the Eleventh Judicial Circuit of Florida and was so appointed by Reno in 1993. Before being retained by the Office of the State Attorney for the Eleventh Judicial Circuit of Florida in or about 1980, Rundle was employed by Adorno's firm of attorneys.

53. Defendant JONHETTE HARDIMAN ("Hardiman") is an Assistant State Attorney for the Eleventh Judicial Circuit of Florida. Hardiman was assigned the investigation of the forgery of the checks drawn on Ana Messer's account in September 1991. Hardiman was named as defendant to Case No. 92-1569.

54. Defendant SAMANTHA DORSEY ("Dorsey") is an Assistant State Attorney for the Eleventh Judicial Circuit of Florida. Dorsey was assinged the investigation of the break-in of my apartment by Juan Roldan in April 1997.

55. Defendant BENNETH BRUMMER ("Brummer") is the Public Defender for the Eleventh Judicial Circuit of Florida.

56. Defendant PATRICK NALLY ("Nally") is an Assistant to

the Public Defender for the Eleventh Judicial Circuit of Florida. Nally was Tannebaum's Supervisor.

57. Defendant BRIAN TANNEBAUM ("Tannebaum") is an Assistant to the Public Defender for the Eleventh Judicial Circuit of Florida.  Tannebaum was assigned Case No. M96-8739.

58. Defendant COUNTY OF MIAMI-DADE ("MDC") is a Municipality.  MDC is an "employer" within the meaning of 42 U.D.C. §§2000(e), Title VII of the Civil Rights Act of 1964, Section 701(b), as amended, and is a "person" as defined by 42 U.S.C. §1983.  MDC may be subject to liability under both statutes. MDC was Plaintiff's employer from January 3, 1983 to June 12, 1989.  MDC was named as Defendant to Case Nos. 89-2864, 90-0230, 92-1569, 98-0087 and 99-1618.

59. Defendant ALEX PENELAS ("Penelas") is the Mayor for the County of Miami-Dade since 1994. Before being elected Mayor, Penelas was a MDC Commissioner.

60. Defendant MERRET STIERHEIM ("Stierheim") is the Manager for the County of Miami-Dade and was so appointed by Peneals in or about March 1998. Stierheim was Interim City of Miami manager between October 1995 and January 1997. Stierheim had been retained as Manager of MDC between 1980 and 1985.

61. Defendant ROBERT GINSBURG ("Ginsburg") is the Attorney for the County of Miami-Dade.

62. Defendant LEE KRAFTCHICK ("Kraftchick") is an Assistant Attorney for the County of Miami-Dade, and attorney of record for MDC and Dade Officials in Case No. 89-2864 and 90-0230.

63. Defendant WILLIAM CANDELA ("Candela") is an Assistant

Attorney for the County of Miami-Dade, and attorney of record for MDC and Dade Officials in Case No. 89-2864 and 90-0230.

64. Defendant ROBERT DAVIES ("Davies") is an Assistant Attorney for the County of Miami-Dade, and attorney of record for MDC and Dade Officials in Case No. 89-2864 and 90-0230.

65. Defendant FRED TAYLOR ("Taylor") was Sheriff for the County of Miami-Dade until in or about April 1997. Taylor was named as defendant to Case No. 92-1569.

66. Defendant CARLOS ALVAREZ ("Alvarez") is the Sheriff for the County of Miami-Dade and was so appointed in April 1997.

67. Defendant LAZARO PEREZ ("Off. Perez") is a Police Officer for the County of Miami-Dade. Perez was the officer that arrested Plaintiff on February 25, 1996.

68. Defendant F. GUERRERO ("Guerrero") is a Police Officer for the County of Miami-Dade. Guerrero was dispatched to the location with Perez on February 25, 1996.

69. Defendant JOHN DOLAN ("Dolan") is a Corporal of Police for the County of Miami-Dade. Dolan effected service of Concepcion's petition for injunction on March 1, 1996, compelling Plaintiff to abandon the premises.

70. Defendant DORIS HERRERA ("Herrera") is a Detective for the County of Miami-Dade. Herrera arrested Plaintiff on March 13, 1996.

71. Defendant ALEJANDRO RODRIGUEZ ("Rodriguez") is a Police Officer for the County of Miami-Dade. Rodriguez transported Plaintiff to the Dade County Jail on March 13, 1996.

72. Defendant DANIEL LLANO ("Llano") is a Sergeant of Police

-34-

for the County of Miami-Dade. Llano supervised Officer Celaya in relation with the case of forgery reported by Plaintiff. Llano was named as Defendants to Case No. 92-1569.

73.  Defendant ALEJANDRO CELAYA ("Celaya") is a Police Officer for the County of Miami-Dade. Celaya was dispatched to RNB to report the forgery. Celaya was named as Defendant to Case No. 92-1569.

74.  Defendant JOAQUIN AVINO ("Avino") was Manager for the County of Miami-Dade from June 1988 to December 1994. Avino was named as Defendant to Cases Nos. 89-2864 and 90-0230.

75.  Defendant ARMANDO MORCATE ("Morcate") was Supervisor of the Personnel Division of Human Resources for the County of Miami-Dade from November 1974 to December 1994. Morcate was named as Defendant to Case No. 89-2864.

76.  Defendant JUAN DE ONA ("Ona") is an Affirmative Action Specialist for the County of Miami-Dade and has been so employed since June 7, 1996. Ona was assigned the investigation of my complaints of discrimination in January 1987, and January 1988. Ona was named as Defendant to Case No. 89-2864.

77.  Defendant FRED CRAWFORD ("Crawford") was the Director of Corrections and Rehabilitations for the County of Miami-Dade ("C&R") until April 1989. Between January 1988, and April 1989, Crawford was the target of a criminal investgation under Reno's control. In April 1989, Crawford was appointed Court Advisor. Crawford was named as Defendant to Cases Nos. 89-2864 and 90-0230.

78.  Defendant LONNIE LAWRENCE ("Lawrence") was appointed

Director of Corrections and Rehabilitations for the County of Miami-Dade in April 1989. Lawrence was named as Defendant to Case Nos. 89-2864 and 90-0230.

79. Defendant KEVIN HICKEY ("Hickey") was the Deputy Director of Corrections and Rehabilitations for the County of Miami-Dade from 1984 and 1991. Hickey was named as Defendant to Case Nos. 89-2864 and 90-0230.

80. Defendant JOSE TORANO ("Torano") was the Director of Administration of Corrections and Rehabilitations for the County of Miami-Dade until October 1988. Torano was named as Defendant to Case Nos. 89-2864 and 90-0230.

81. Defendant FRANCIS BROPHY ("Brophy") was Assistant Director of Administration of Corrections and Rehabilitations for the County of Miami-Dade and appointed acting Director in October 1988. Brophy was named as Defendant to Case Nos. 89-2864 and 90-0230.

82. Defendant RICARDO ORTEGA ("Ortega") was appointend Accountant III and Supervisor of Administration of Corrections and Rehabilitations for the County of Miami-Dade in February 1987. Ortega was employed as Accountant II with the same department from September 1985 to February 1987, as Accountant I from September 1984 to June 1985, and as Account Clerk from 1982 to 1984. Ortega was named as Defendant to Case No. 89-2864 and 90-0203.

83. Defendant GERALD JONES (Jones") is a Supervisor of Support Services of Corrections and Rehabilitations for

the County of Miami-Dade and has been so employed since 1983. Jones was named as Defendant to Case No. 89-2864 and 90-0203.

84. Defendant HARRIET HART ("Hart") was a Supervisor of Support Services of Corrections and Rehabilitations for the County of Miami-Dade until 1989. Hart died in 1992. Hart was named as Defendant to Case No. 89-2864 and 90-0203.

85. Defendant JOHN BARLI ("Barli") was the Chief Accountant of Housing and Urban Development for the County of Miami-Dade ("HUD") until his retirement in 1990. Barli died in 1991. Barli was named as Defendant to Case No. 89-2864 and 90-0203.

86. Defendant CHRISTOPHER CAPUTO ("Caputo") is a Director of Personnel of Housing and Urban Development for the County of Miami-Dade and has been so employed since 1969. Caputo was named as Defendant to Case No. 89-2864 and 90-0203.

87. Defendant STEPHEN ROSENBAUM ("Rosenbaum") is an Accountant II with Aviation for the County of Miami-Dade. Rosenbaum was Supervisor of Housing and Urban Development for the County of Miami-Dade from 1978 to 1991. Rosenbaum was named as Defendant to Case No. 89-2864 and 90-0203.

88. Defendant RODOLFO PEREZ ("R. Perez") is a Supervisor of Housing and Urban Development for the County of Miami-Dade and has been so employed since 1982. Perez was named as Defendant to Case No. 89-2864 and 90-0203.

89. Defendant GEORGE SPOFFORD ("Spofford") was the Director of Administration of Aviation for the County of Miami-Dade until 1989. Spofford was named as Defendant to Case No. 89-2864 and 90-0203.

-37-

90. Defendant CITY OF MIAMI ("Miami") is a Municipality. Miami is a "person" as defined by Title 42 U.S.C. §1983, accordingly, sujected to liability under the statute. Miami was named as Defendant to Case No. 92-1569.

91. Defendant DONALD WARSHAW ("Warshaw") was the Chief of Police for the City of Miami until April 1998, when he was apointed City manager by Mayor Joe Carollo.

92. Defendant JOHN BUHMASTER ("Buhmaster") was an Assistant Chief of Police for the City of Miami until 1999.

93. Defendant GEORGE CADAVID ("Cadavid") is a Lieutenant of Police for the City of Miami. Plaintiff's request for amendment of the report written by Piulats in reference to the break-in by Diaz was referred to Cadavid.

94. Defendant RODRIGO LLANES ("Llanes")is a Sergeant of Police for the City of Miami. Llanes is Piulats Supervisor that was dispatched to the location when Plaintiff called to report the break-in on March 27, 1997.

95. Defendant ANTONIO PIULATS ("Piulats") is a Police Officer for the City of Miami. Piulats was dispatched to the location and wrote the report of the incident of break-in by Diaz on March 27, 1997.

96. Defendant RICARDO CHAVEZ ("Chavez") is a Police Officer for the City of Miami. Chavez was physically present when Diaz broke-in the efficiency on March 27, 1997.

97. Defendant CALVIN ROSS ("Ross") was the Chief of Police for the City of Miami when Plaintiff reported the incident of

fraud and forgery on September 10, 1991. Ross was named as Defendant to Case No. 92-1569.

98.     Defendant ROBERT CHEATHAM ("Cheatham") was a Major of Police for the City of Miami. Cheatham directly supervised the Fraud & Forgery Unit when Plaintiff reported the incident of fraud & forgery on September 10, 1991. Ross was named as Defendant to Case No. 92-1569.

99. Defendant ANTONIO MESA ("Mesa") is a Sergeant of Police for the City of Miami. Mesa was in charge of the Fraud & Forgery Unit when Plaintiff reported the incident of fraud & forgery on September 10, 1991. Mesa was named as Defendant to Case No. 92-1569.

100. Defendant CELESTINO PERERA ("Perera") is a Detective for the City of Miami. Perera was assigned the investigation of the incident of fraud & forgery on September 10, 1991. Perera was named as Defendant to Case No. 92-1569.

101. Defendant SOUTHERN BELL Telephone and Telegraph Company (Southern Bell") is a public utility. Plaintiff was a customer of Southern Bell from November 1978 to December 1991. Southern Bell was named as Defendant to Case No. 89-2864.

102. Defendant REPUBLIC NATIONAL BANK OF FLORIDA ("RNB"); is the financial institution in which Ana Messer, Plaintiff's mother had a checking account in trust for the Plaintiff. RNB was named as Defendant to Case No. 92-1569.

103. Defendant BARNETT BANK TRUST COMPANY, N.A. ("Barnett") is a trustee of the State of Florida. Barnett is the Plaintiff to Case No. 94-20188 filed in the Circuit Court for the Eleventh

## STATEMENT OF CLAIM

### COUNT I

### CLAIM UNDER TITLE 28 U.S.C. §§2671, et seq. AND 1346(b)

### AGAINST THE UNITED STATES OF AMERICA

1. This is an action against the United States of America under Title 28 U.S.C. §§2671, et seq., and 1346(b) for money damages for the the personal injuries and injury and loss of property caused by the tortious acts and omissions of Defendants Marcus, Reno, Reagan, Bush, Carter, Clinton, Freeh, Albright, John Does I, John Does II, John Does III, Starr, Ray, Udolf, Helms, Graham, Torricelli, Gingrich, Hyde, Burton, Ros-Lehtinen, Diaz-Balart, Cedeno, King, Roettger, Johnson, Ungaro-Benages, D. Graham, Moore, Turnoff, Nesbitt, Garber, Zloch, Davis, Barkett and Black. The Defendants are former or present employees of federal agencies of the executive, judicial or legislative branches of the government of the United States within the meaning of §2671, and were acting within the scope of their offices or employment for purpose of Title 28 U.S.C. §§2671 and 1346(b).

2. Plaintiff is a Hispanic female of Cuban national origin. Plaintiff obtained the citizenship of the United States for naturalization in June 1985. Plaintiff arrived at the United States on October 3, 1978, through a Program of Repatriation established under the Administration of Defendant Carter. Plaintiff's mother, Ana Messer Jimenez, was born in Cuba, but she was granted the United States citizenship because her father, Alfred Messer Nichols, was natural from Atlanta, Georgia.

-44-

3. Alfred Messer Nichols married Ana Jimenez Hernandez, natural from Cuba, and had three children with his Cuban wife: Alfredo, Ana and Julio. Alfred Messer Nichols had a daughter, Clarita, from a previous marriage with and Anglo female that he took to live in Cuba with him and was raised by his Cuban wife and mother-in-law. Upon information and believe, Defendant John Does I made Alfred Messer Nichols and the family that he created with his Cuban wife the target of a vendetta for his decision to marry a Cuban lady and to take Clarita to live in Cuba with him and his Cuban wife (AFF7-35).

4. Alfred Messer Nichols' oldest son died as consequence of an accident in or about 1932. Ana and husband, Arturo Ron Fornes, had three children, Ana Maria, Arturo (Ron) and Ada (Plaintiff). Julio had four children: Nilo, with his first wife, Concepcion Pujol; and Julio, Jr., Miriam and Cesar with his second wife Lilia Machado.

5. Ana Messer Jimenez and Arturo Ron Fornes' marriage was terminated in 1957. The divorce was caused by the pattern of wrongful conduct adopted by Arturo after engaging in an extramarital relationship with Defendant Gloria, employed with the bank in which Arturo officiated as Vice-President. Acting as an agent of John Does I and at John Does I's instigation, Arturo engaged in a pattern of unlawful acts for the purpose of despoiling Ana of her property and depriving her of the custody of their children. Arturo forged Ana's signature on the stocks of the bank that belonged to her and intended to appropriated the home furniture and other property. In pursuance

-45-

of a conspiracy with John Does I, Arturo and Gloria plotted to defraud the bank in several thousands dollars. As result of Arturo and Gloria's acts, the bank was compelled into bankruptcy and Arturo was indicted for embezzlement, convicted and confined to a Cuban jail, El Pricipe (AFF7-20,36,46).

6. Fulgencio Batista was the President of Defendant Republic of Cuba, when Arturo was confined to the Cuban jail. Thereupon, John Does I corruptly conspired with then President of the United States, Dwight Eisenhower, to cause the overthrow of Batista's government and to secure Arturo's release from the Cuban jails, by corruptly influencing Defendant Castro, who took over in Cuba on January 1, 1959.

7. After securing Arturo's release from jail, John Does I conspired with Arturo to prevent Ana from leaving the island with their children. In pursuance of the conspiracy, Arturo refused to authorize Ron to travel to the United States with a visa waiver in 1960, and caused Ron's arrest by the Castro's police forces on several occasions in 1961, with the intent to intimidate and coerce Ron to act in pursuance of John Does I's conspiracy opposing every further attempt made by Ana to leave Cuba with the children. As a condition implicitly or explicitly imposed on Arturo and lover to grant their admission to territory of the United States, John Does I instigated Arturo to develop in Ron the evil feelings that turned Ron in the abuser of her mother that Arturo, acting as John Does I's agent and in furtherance of John Does I's conspiracy to inflict on Alfred Messer Nichols' Cuban female descendants cruel and unusual

-46-

punishment and severe emotional distress, intended to be when Ana requested the separation and the divorce (AFF7-6,9,10).

8. Meanwhile, John Does I secured the permanency of Castro in power, by conspiring with President Kennedy to cause the defeat of the Bay of Pigs invasion of Cuba in April 1961, and the Kennedy-Krushchev pact reached between Defendant United States and the USSR at the end of the missile Crises of October 1962. Through said pact, the United States pleaded to the USSR that the United States would not invade Cuba. In 1964, having a greater degree of certainty that Castro was consolidated in power in Cuba, Ron and Gloria emigrated to the United States, where John Does I conspired to conceal Arturo and Gloria's past and to fabricate for them a false image of honorable persons, while John Does I corruptly influenced Castro to impede Ana and the children to leave Cuba (AFF7-38,40,91).

9. John Does I corruptly influenced some Cuban exiles recruited by the CIA to participated in the failed invasion of Cuba to create a group knonw as RECE. As Rece member, Jorge Mas Canosa, Cuban Exile, joined in the commando groups that plotted raids in Cuba, but never landed in teh island. Mas Canosa expected to become the President of Cuba after the overthrow of Castro's regime. As years passed and Castro remained in power, John Does I provided Mas Canosa with the economic power, through the acquisition of Church & Towers, to become the "caudillo" of the Cuban exile of Miami, Florida (AFF7-37).

10. In furtherance of the scheme to impede Ana and the children from leaving the island, in September 1965, John Does

I corruptly influenced Castro to pass a law that prohibited males between the ages of 15 and 27 from leaving the country. Ron was then 20 years old and the law enacted by the Cuban government prevented Ron, and consequently Ana from leaving the island in at least seven years, while John Does I conspired with the Cuban exiles to prevent any situation that could jeopardize the new image that John Does I was compromised to create for Arturo and Gloria.  In pursuance of John Does I's scheme the Cuban Exiles of Miami, prevented Alberto, Arturo's brother, from securing a job in the United States, compelling Alberto and family, who had broken up with Arturo as result of Arturo's wrongful conduct, to leave the United States for a third country.

11. In or about December 1969, Plaintiff and her sister obtained the funds to pay for their air fares to travel to Spain. Plaintiff's sister's air fare was paid with the proceed from the sale of some collections of stamps that belonged to the deceased grandfather, Arturo's father. When Plaintiff's intended to request the funds to pay for her air fare to Arturo that was residing in New Jersey, her aunt Eva tried to dissuade her. John Does I authorized Arturo to remit the money for the sole purpose of concealing Arturo's participation in the conspiracy to impede the children from leaving Cuba. Meanwhile, John Does I corrutply inlfluenced Castro to prevent the Plaintiff and sister from leaving Cuba by closing the flights Havana-Madrid. In pursuance of John Does I's scheme, the Cuban Department of Immigration did not accept application to travel via Havana-

-48-

Madrid submitted after May 31, 1970, rejecting the application submitted by Plaintiff in or about June 1970 (AFF7-7).

12. As result of John Does I's direct or indirect influence, in or about March 1970, Eva married a member of the MININ (Cuban Ministry of Interior) and about seven months later, Ron married with Defendant Nancy, affiliated to the Cuban government whose brother-in-law, like Eva's huusband, belonged to the MININ. Eva and her husband and Nancy and relatives engaged in the concerted effort to prevent Plaintiff and sister from leaving Cuba in furhterance of John Does I's conspiracy (AFF7-8).

13. Meanwhile, Ron's misconduct at home escalated to the point that in June 1972, Ron intended to burn down the house with the entire faily inside, including his one month old son. When Plaintiff heard Ron's screaming and left her bedroom to find out the reason of Ron's anger, she saw that Ron was on the floor and her mother, her sister and Nancy were also on the floor trying to get from Ron the matches that Ron intended to light in an area where he had spread some combustibe. Plaintiff's mother, sister and Nancy could not bring Ron under control and Plaintiff called the police, who transported Ron to theDepartment of Legal Medicine, where Ron was submitted to a psychiatric evaluation. The diagnosis of the panel of Psychiatrists from the Cuban Department of Legal Medicine, was schizophrenia with severe aggressiveness. Ron was referred to the Psichiatric Hospital of Havana. After Ron's release from the hospital, secured by Nancy's relatives, Nancy traveled to

-49-

Oriente, where she stayed for about two years. Ron was most of the time in Havana and engaged in conduct aimed at punish Plaintiff. Ron's reprisals were instigated by John Does I, acting directly or through Arturo, Eva and Nancy's relatives.

14. Ron's violence and the diagnosis of the Cuban Department of Legal Medicine were actions instigated by John Does I, acting directly and through Arturo, Gloria and Eva, for the purpose to develop in Ron an ill desire to injure Plaintiff whose only action was to call the police, but was not in contact with the police that transported Ron to the Morgue, nor did she speak with the psychiatrists that evaluated Ron.

15. In or about September 1973, Plaintiff, being unable to leave Cuba, decided to resume her studies and to secure a job. Directly or indirectly influenced by John Does I, Defendant Ron engaged in a course of actions aimed at interfering with Plaintiff's plans instigating the Cuban authorities to impose to Plaintiff as a condition to register at the school her consent to sign a paper renouncing to her request to leave Cuba. Plaintiff's mother spoke with Christian Lleo, a family friend that was employed by the MINED (Cuban Department of Education), who had in turn a friend, Raul Ferrer, with a high position in the MINED. Lleo and Ferrer secured Plaintiff's registration at the school and in the University of Havana where Plaintiff studied Licenciatura en Matematicas obtaining the best qualifications, and the job MINED teaching Mathematics that Plaintiff wanted, where her performace was rated outstanding.

16. When Plaintiff secured her registration at the school, Ron, instigated by John Does I, acting directly or through Arturo, Eva and Nancy's relatives, furthered her actions aimed at interfere with Plaintiff's activities by conspiring with Nancy's sister and brother-in-law, Ileana and Martin, the latter member of the MININ, to engage in a course of actions to cause trouble to Plaintiff. In or about May 1974, when Plaintiff was attending the school and had recently engaged with Jorge Fernandez with whom Plaintiff subsequentlly married, Ron and Ileana engaged in the effort to compel Plaintiff out of her home by falsely filling a request for a transfer out of the household in the office where Ileana did voluntary work. Plaintiff requested the cancellation of the fraudulent papers, but Ron, with Ileana's confabulation, furthered his outrages to injure Plaintiff, by causing the issuance of a summons compelling Plaintiff to appear before an arbitrator of the Defendant Cuban Popular Tribunal where Ron appeared with an attorney hired and paid by Eva to move for Plaintiff's submission to a psichiatric evaluation. Plaintiff, appearing without legal counsel, did not oppose the motion (AFF7-12,16,18).

17. Plaintiff appeared at the Psychiatric Hospital of Havana carrying the evidence of her performance in the school. Right after the evaluation, Plaintiff was released from the hospital. Plaintiff was not given any medication, nor was she administered any other treatment during the hours that she was retained in the hospital, or after her release. The attorney hired by Plaintiff's fiance, Jorge Fernandez, secured the dismissal of

-51-

the action at the next hearing before the arbitrator of the Popular tribunal. Ron's efforts to interfered with Plaintiff's career and employment in Cuba failed. It was after the submission of Plaintiff to a psichiatric evaluation, that Plaintiff obtained a registration for the best school in Vedado, the job as Math professor and the registration for the University of Havana.

18. When Ron's efforts to interfere with Plaintiff's career and employment in Cuba failed, John Does I furthered the conspiracy to terminate Plaintiff's success by securing Carter's victory in the Presidential election of 1976, with the intend to, acting through the Carter Administration, create the Repatriation Program that brought Palintiff to the United States where a plan had been carefully designed to deprive Plaintiff of the basic rights and fundamental freedoms secured to all persons under international law and to inflict on her cruel and unusual punishment and severe and extreme emotional and mental distress in furtherance of the vendetta against Alfred Messer Nichols' Cuban female descendants.

19. John Does I's scheme was not actually to permit Ana Messer and family access to territory of the United States. The plan was to compel Plaintiff to join in Ana Messer's request to leave Cuba through the Repatriation Program created in 1978 by President Carter, with the intent to secure Plaintif's resignation to her emplyment in Cuba, subsequently causing the frustration of Ana Messer's plan to travel throught the Repatriation Program, instigating Ron's refusal to leave Cuba. When Ana Messer did not cancel her application, John Does I

conspired with Castro to compel Nancy and Ron to join in Ana Messer's application because Ron and Nancy were John Does I and Arturo's allies in a plan that Plaintiff's ignored and consisted in submitting Ana Messer to legal guardianship upon her arrival and the United States and to make Ana Messer the target of unconstitutional electronic surveillance to prevent Ana Messer from revealing any information about Arturo and Gloria's past.

20. John Does I conspired with Carter and with members of the United States Congress to pass the Foreign Inteligence Surveillance Act ("FISA") Title 50 U.S.C §1801, et seq., on October 25, 1978, twenty two days after Ana Messer's arrival at the United States, and Executive Order 12139 a few months later, to, arbitrarily labeling Ana Messer "a foreign power" or "an agent of a foreign power" to make her the target of electronic surveillance under the FISA (AFF7-57).

21. Upon her arrival at the United States, Plaintiff applied for employment with the United States Post Office and passed the employment test with a score of 89.5, which made her elegible to work with that agency of the federal governemnt of the United States. Plaintiff and Plaintiff's husband also obtained grants to attend a University, and registered with the Biscayne College a branch of St. Thomas University in January 1979 (AFF7-32,57).

22. Meanwhile, John Does I instigated Arturo to dissuade Plaintiff from pursuing a career in the United States and conspired with members of the Cuan Exile of Miami to prevent Plaintiff's husband from securing employment in Miami, and to

entice Plaintiff's husband to leave the United States for Dominican Republic to complete her career of Medicine in said country, tempting him with promises for advancement in the United States that Defendant John Does I did not intend to keep, at least, not if Jorge continued to be married with Plaintiff a female descendant of Alfred Messer Nichols, condemned by John Does I to suffer misery, ignominy, humiliations, distress vexations and embarassment. John Does I, exercided through the Cuban Exile of Miami, caused that Jorge dropped out from the University and secure an 18-hour per day employment to save the money to move to Dominican Republic, while Plaintiff worked the night shift in the Post Office and continued to attend the University where she graduated with honors and GPA of 3.71 obtaining Bachelor in Arts with a major in Accounting in August of 1981. In 1984, Plaintiff passed the CPA exam with the State of Florida (AFF1-1).

23. Upon learning that Ana Messer had submitted her application to enter the United States through the Repatriation Program, John Does I and Carter, in pursuance of a pattern of conduct deliberately adopted that consists in committing the torts against Alfred Messer Nichols' Cuban female descendants by acting through an Anglo female, secured Janet Reno's appointment for State Attorney for the Eleventh Judicial Circuit of Florida, and corruptly conspired with Reno to act in pursuance of John Does I's conspiracy to deprive Alfred Messer Nichols' Cuban Female descendants of the human, civil and constitutional rights (AFF7-90).

24. After the defeat of President Carter in the Presidential election of 1980, John Does I conspired with Reno to join the most powerful members of the Cuban Exile of Miami under Defendant CANF with the intent to influence the Administration of the newly elected Republican President, Defendant Reagan, acting through the CANF (AFF7-47). Meanwhile, Reno conspired with Dade Officials, including the Mayor of Dade, Steve Clak, to coruptly influence the Officials of the CANF, including Defendants Mas Canosa, F. Hernandez and A. Hernandez, and the Officials of Church & Towers, Mas Canosa and Defendant Adorno, by steering lucrative contracts with MDC to Church & Towers, in pursuance of the scheme to use part of the proceeds from said lucrative contracts to funnel substantial contributions, acting through the CANF, to the campaigns of local politicians, including Reno and Clark, and to electoral campaigns of Democrats and Republicans throughout the country, developing the CANF a strong arm lobby in Washington, D.C., during the twelve years of the Republicans Administrations of Defendants Reagan and Bush. Reno conspired with Mas Canosa and Adornon to secure employment for Defendant Rundle, former employee of Adorno's firm, with the Office of the State Attorney under her control, with the intent to conceal her participation in the conspiracy to deprive Alfred Messer Nichols' Cuban females descendants of their rights under the laws and the constitution of the United States by acting through members of the Cuban Exile (AFF7-60).

25. In or about November 1980, Plaintiff's uncle and wife, Jilio and Lilia, informed Plaintiff that her mother was working

for a factory to pay the rent of the dwelling where she was living with Ron and family because Ron and Nancy refused to work. In furtherance of John Does I's conspiracy to punish Ana Messer for her having emigrated to the United States, Ron and Nancy were instigated to reject every job offer that they receive. When Plaintiff called her mother and offered her financial assistance, John Does I, fearing that Ana Messer could move with her daughter frustrating the scheme to have Ana Messer under Ron's control, conspired with Reno, Rundle, the CANF and Church & Towers, to secure employment for Nancy with the Child Support Division of the State Attorneys Office, in spite of Nancy's failure to meet the requirements of the position that required the possession of a high school diploma. Defedants Reno and Rundle secured emloyment for Nancy with an Division under their control to prevent Ron, Nancy and Nancy's relatives' truthful testimony to any matter related with Ana Messer in pursuance of John Does I's covert plan to impede the termination of the fraudulent guardianship and unconstitutional surveillace of Ana Messer, and any matter related to Plaintiff in pursuance of John Does I's covert plan to hinder Plaintiff's professional and social development (AFF7-61).

26. When Plaintiff graduated with the illusion to reap a reward for her past efforts, Reno conspired with Rundle, the CANF and Church & Towers to prevent Plaintiff from securing a job. Plaintiff was first maliciously induced to resign to her job with the Post Office with a fraudulent offer of employment with Overseas Properties, Inc. Upon learning that

Plaintiff had applied for employment with Defendant MDC, and had passed the employment test with the highest score county wide, Defendants John Does I and John Does II secured Respondent Marcus' appointment as United States Attorney for the Southern District of Florida. Defendant Marcus established a strong partnership with Reno, to deprive Plaintiff of the rights secured to all Americans citizens under the laws and the Constitution of the United States, by hindering Plaintiff's advancement, by making her the target of unconstituional electronic surveillance, by denying her the right to own, enjoy and alienate property, by infiltrating and disrupting her private relations and activities, and by impeding her from obtaining relief interfering with her access to the courts of the United States.

27. Defendant Marcus conspired with Reno to conceal himself and his participation in the commission of the violations Plaintiff's civil and constitutional rights, and to inflict on Plaintiff cruel and unusual punishment and severe emotional distress, by acting through Dade Officials and the Cuban Exile, including the Officials of the CANF and Church & Towers, Rundle, and Roura. Marcus conspired with Reno, Dade Officials, Rundle, the CANF, Church & Towers and Roura, to prevent Plaintiff from securing a job with MDC, by deliberately excluding her name from the list of elegible applicants when Plaintiff passed the test in June 1982. When Plaintiff was hired in January 1983, thanks to the intervention of Commissioner Valdes and County Manager Ojeda, Defendants Marcus, Reno, Rundel, Roura, Ron, Nancy, the CANF and Church & Towers conspired with Dade Officials

-57-

to make Plaintiff the target of a pattern of unlawful sexual harassment, discrimination and retalation, imposing her as condition to receive the promotion that was approved for her in March 1983, her submission to the sexual demands of a male supervisor (AFF1-1-10,AFF2-14-21).

28. In September 1983, the Department of HUD employee Relations reported the inequitable treatment received by the the employes of HUD Accounting Section, and the law morale of its staff. Between January and September 1984, Plaintiff on several ocassions complained of the sexual conduct of Supervisor Perez and of co-workers Barba and Banos to Defendants Morcate and Barli, but, corrutply influenced by Marcus, Reno, Rundle, the CANF, Church & Towers and Roura, in pursuance of the joint venture with John Does I to inflict on Plaintiff extreme emotional distress, Dade Officials refused to correct their wrongs. In retaliation for her having complained of the harassment, and in furtherance of the scheme to deny her a meningful access to the courts, Marcus and Reno designed an unlawful scheme to entrap Plaintiff and instigated Rundle, the CANF, Churh & Towers, Roura, Ron and Nancy to engage in course of actions to defame Plaintiff (AFF6-180,AFF7-66).

29. In pursuance of Marcus' scheme, Rundle and Nancy instigated Maria Delgado to induce Plaintiff to accept to date with Defendant Rosenbaum, who introduced Plaintiff to his parents. When Plaintiff accepted to date with Rosenbaum in October 1984, Marcus schemed with John Does II, Dade Officials, Reno, Rundle, the CANF, Roura, Ron and Nancy to make Rosenbaum

-58-

the target of a harassing investigation to coerce Rosenbaum into consenting to intercept Plaintiff's oral and wire communications. Marcus and Reno furthered the scheme to inflict on Plaintiff severe and extreme emotional distress by conspiring with Dade Officials, Rundle, the CANF, Church & Towers, Roura, Ron and Nancy to coerce Plaintiff's reassingment as Rosenbaum's probationary subordinate where Plaintiff's employment would be conditioned to her submission to Rosenbaum's sexual demands.

30. In furtherance of John Does I's and John Does III's conspiracy to inflict on Plaintiff cruel and unusual punishment and severe emotional and mental distress, when Plaintiff secured a lateral transfer for the C&R Department of MDC in March 1985, to work in an office inside the jail that Plaintiff accepted trying to escape the sexual harassment of HUD, Marcus and Reno schemed with Rundle, Dade Officials, the CANF, Church & Towers, Roura, Ron and Nancy to ruin Plaintiff's career and employment record by preventing her from securing a permanent status with every other epartment with the intent to coerce her reassingment for HUD under Rosenbaum's supervision, and by imposing her unlawful demotions and reassingments in retaliation for her refusal to accept Rosenbaum's request for a date and a reassignment for HUD.

31. In pursuance of the scheme, in January 1986, after Plaintiff's refusal to meet with Rosenbaum that was instigated to call Plaintiff at her office of C&R, Plaintiff was given a promotion to Accountant II with Aviation for the sole purpose of preventing her from achieving a permanent status as Accountant

I with C&R where her performance had been rated outstanding for eleventh months. A year later, when Plaintiff was working as Accountant II with Aviation, Rosenbaum was instigated to call Plaintiff at her office. In retaliation for Plaintiff's refusal to accept Rosenbaum's request for a date in September 1986, and for her having stated that she would not accept a reassignment for HUD in a wire communication that was intercepted by Reno, Marcus and John Does II in November 1986, John Does I, John Does II, John Does III, Marcus, Reno, Rundle, the CANF, Church & Towers, Roura, Ron and Nancy furthered the joint venture to inflict on Plaintiff severe emotional and mental distress by terminating her Accountant II employment with Aviation before achieving a permanent status and by compelling her reassingment for C&R where a scheme had been already designed to make her the target of harassment, humiliations and vexation, and to discharge her before completion of probation, on said occasion, three days before becoming permanent, infringing Plaintiff's right to pursue her profession and impairing Plaintiff's interest in her reputation by introducing a defamatory evaluation in her record without affording her the opportunity to clear her name (AFF1-13-36, AFF2-4).

32. When Rosenbaum was instigated to call Plaintiff at Aviation in July 1986, the purpose of the conspiracy was not only to compel Plaintiff's reassignment for HUD under Rosenbaum's supervision. Plaintiff had entered into a contract to buy a house with Interdevco Properties Inc., and John Does I, John Does III, Reno and Marcus designed a scheme to prevent

from buying said house in pursuance of John Does I's covert plan to keep Plaintiff's mother under Ron's control and to deprive Plaintiff of the right to acquire and enjoy property, acting through Rosenbaum. The scheme carefully designed consisted in preventing the successful completion of Plaintiff's contract with Interdevco to buy said house through a pre-construction plan, and to despoil Plaintiff of the deposit held by the Developer that Rosenbaum would be arbitrarily vested with authority to appropriate to prevent her from buying other house.

33. When Plaintiff refused to date with Rosenbaum in September 1986, and told Rosenbaum that she was bound in a contract to buy a house, was saving great part of her salary and did not intend to change her plans, John Does I, John Does II, John Does III, Reno, Marcus, the CANF, Church & Towers, Roura, Ron, Nancy and Dade Officials furthered the conspiracy to infringe Plaintiff's right of privacy, and designed a scheme to appropriate Plaintiff's property if Plaintiff's intended to attend the courts of the United States to exercise her right under U.S. Constitutional Amendment 1 to petition for redress of her grievances against Dade Officials. In pursuance of the scheme, John Does I, John Does II, John Does III, Reno, Marcus, Rundle, the CANF, Church & Towers, Roura, Ron, Nancy, Arturo and Gloria corruptly influenced Defendant Kislak to fraudulently induce Plaintiff, who had no knowledge, and no reason to know that her mother was the target of electronic surveillance or was subjected to legal guardianship, to name her mother in her application for loan to finance that property (AFF7-72).

34. After naming Ana Messer in Plaintiff's mortgage, John Does I, John Does II, John Does III, Reno and Marcus conspired with Defendant Reagan to make Plaintiff's residence the target of electronic surveillance under Title 50 U.S.C. §1801, et seq., by arbitrarily labeling Plaintiff's property the "premises of a foreign power", and to subject Plaintiff's property to the control of a legal guardian appointed for Plaintiff's mother property, in pursuance of a joint venture with Dade Officials to deprive Plaintiff of her rights secured under the laws and the Constitution of the United States by infiltrating and disrupting Plaintiff's private associations, including Plaintiff's engagement with Orlando Farah and their plan of marriage, by wrongfully disseminating Plaintiff's private affairs, by corruptly influencing every decisions affecting Plaintiff's employment to subject her to a more pervasive pattern of unlawful harassment, discrimination and retaliation, and by denying to Plaintiff the right to a meaningful access to the courts of the United States (AFF7-74-80).

35. In furtherance of John Does I's, John Does III's, Reno's and Marcus' scheme to inflict on Plaintiff severe and extreme emotional and mental distress by compelling Plaintiff into financial hardship, Dade Officials furthered the unlawful pattern of discrimination and retalation against Plaintiff, by terminating Plaintiff's employment as Accountant I with the Administrative Division of C&R in January of 1988, by imposing her a retaliatory suspension for her having filed a complaint with EEOC, and by terminating her employment with MDC under

false charges of sabotage after having filed a second complaint with EEOC for retaliation. Defendant Marcus conspired with Reno, Rundle, Dade Officials, Roura and the CANF to instigate in Ron and Nancy a selfish desire beyond reason to appropriate every piece of property that belonged to Plaintiff to punish Plaintiff for her having rejected Rosenbaum and her having engaged with Farah, who, as result of John Does I's, John Does II's, John Does III's, Marcus', Reno's and Rundle's joint venture with Dade Officials to infringe Plaintiff's right of association had become the target of a conspiracy to ruin his business leaded by the CANF, Church & Towers, Roura and Rundle (AFF7-81)

36. Meanwhile, John Does I, John Does II, John Does III, and Marcus conspired with Reno, Rundle, the CANF, Church & Towers, Roura, Ron and Nancy to make Plaintiff's residence the target of break-ins and burglaries, and schemed to raise Dade Officials' false allegations that Plaintiff's employment had been terminated because Plaintiff was doing sabotage in C&R to corruptly influence Defendant Bush to make Plaintiff and her premises the target of video surveillance in pursuance of the conspiracy to infiltrate and restrict Plaintiff's legitamate activities to lease or sell her property with intent to compel Plaintiff's bankruptcy and the foreclosure of her mortgage, and to cause Plaintiff to suffer misery, ignominy, vexation, humiliations, embarassment, and severe physical, emotional and mental distress (AFF2-43, AFF4-62,AFF7-120-124).

37. The manner in which Defendants John Does I, John Does II, John Does III, Marcus and Reno a conspired with Dade

Officials, Ron, Nancy, the CANF, Church & Towers and Roura, to ruin Plaintiff's career and employment record, to prevent her from securing another job, to interfere with Plaintiff's right of enjoyment and alienation of property, and to disseminate in slanderous manner the information obtained as result of the unconstitutional surveillance wrongfully authorized by Defendant Reagan with the intent to make Plaintiff recall every day, every minute that her private communications inside her home were being intruded and publicized and to deter her from furthering her plans to marry with Farah, show Defendants' reckless disregard for Plaintiff's rights and an evil desire to inflict on Plaintiff severe emotional and mental distress (AFF7-77).

38. After the termination of Plaintiff's employment with MDC, Defendants John Does I, John Does II, John Does III, Marcus and Reno, who corruptly influenced the investigation and determination of Plaintiff's charges with EEOC, furthered the scheme to deny to Plaintiff a meaningful access to federal forums to petition for redress of her grievances against Dade Officials by corruptly influencing other court officers Weisman, Ruben, Cornell, Kozin to act in pursuance of the conspiracy to injure Plaintiff and her case, preventing Plaintiff from securing effective legal representation. Defendants Marcus, Reno, Rundle, Ginsburg and Kraftchick corruptly influenced Ruben to coerce Plaintiff into consenting to file her lawsuit against Dade Officials in the courts of the Eleventh Judicial Circuit of Florida in pursuance of the scheme to prevent Plaintiff from attending the courts of the United States and to continue to

conceal the involvement of United States' officials in the joint venture with Dade Officials to deprive Plaintiff of her federally protected rights, to hinder her advancement and to subject her to the pattern of harassment, discrimination and retaliation that she endured throughout her employment with MDC (AFF2-12).

39.   When Plaintiff refused to file her case in the Florida courts, Dafendant Marcus conspired to corruptly influence the due course of justice, securing the assignment of Plaintiff's civil rights action to his court and corruptly conspired with Attorney Cornell to mislead Plaintiff into believing that Case No. 89-2864 had been assigned to his court because he was a very "compassionate" judge. Meanwhile, Marcus fraudulently predetermined the outcome of Plaintiff's case with the Defendants, their attorneys and Reno. In furtherance of John Does I's scheme to commit the wrongs against Alfred Messer Nichols' Cuban female descendants by acting through an Anglo female, Marcus conspired to assign Plaintiff's civil rights action to Defendant Johnson to conduct the discovery process and intended a fraudulent trial of Plaintiff's claims before Magistrate Johnson with a right to appeal to his court in pursuance of the scheme to conceal the evidence of the pattern of violations of Plaintiff's rights, the involvement of federal officials, including himself, in the violations, and the injuries that Plaintiff's was sustaining (AFF5,AFF7-93).

40. In pursuance of the conspiracy to obstruct the due course of justice by corruptly influencing Attorney Kozin to advise Plaintiff to file a second action, Case No. 90-0230,

-65-

instead of amending the complaint filed by Cornell in Case No.
89-2864, and conspired with Defendants Ginsburg and Kraftchick
to file a complaint urging his court to close Case No. 89-2864
knowing that Plaintiff's Title VII claims for the unlawful
demotions given her in January 1987, and January 1988, were
untimely under the second case (AFF6-28).

41. In furtherance of the conspiracy to inflict on Plaintiff
severe emotional and mental distress, Defendant Marcus, acting
through Defendant Johnson, fraudlently concealing himself and
his participation in the most egregious conduct involving a
corruption of the judicial process, prevented Plaintiff from
engaging in meaningful discovery by denying fifteen of the
sixteen motions to compel discovery filed by Plaintiff, conspired
to introduce in the records sworn answers containing Defedants'
misleading and false testimony, interfered with Plaintiff's
efforts to inspect MDC's records that are public records to
impede Plaintiff from obtaining the evidence necessary to
substantiate her claims, compelled Plaintiff to pay and re-pay
filing and service of process fees, intentionally delayed a
trial of the case through dilatory motions to dismiss, and
retaliated against Plaintiff through the orders signed by Johnson
every time that Plaintiff introduced in the records of the court
a piece of evidence showing the retaliation that she was enduring
as result of Marcus' own conspiratorial acts with the CANF,
Roura and other Cuban exiles with the intent to deter her from
attending the court to testify freely, fully and truthfully
to the matters pending therein (AFF5,AFF6-29).

-66-

42.    John Does I, John Does II, John Does III, Marcus, and Reno conspired with Rundle, Ron, Nancy, the CANF, Roura, to prevent Plaintiff from introducing her mother's testiony into evidence by plotting to conceal the pancreatic cancer that Ana Messer suffered that was diagnosed in or about August 1989, and denying Ana Messer the treatment that could have prolonged her life.   On January 8, 1991, Plaintiff's mother was deposed by Defendants Krafchick and Candela. While the transcripts of Ana Messer's depositions were concealed and suppressed, and Marcus intentionally delayed the trial of Plaintiff's case, Plaintiff's mother was applied an intensive therapy which was opposed by one of the physicians. On or about March 3, 1991, when Plaintiff opposed the surgery proposed for Ana Messer and told Ron her intentions to seek a second opinion about Ana Messer's illness, Ron engaged in pattern of harassment of Plaintiff, that was directly or indirectly instigated by Marcus, Reno, Rundle, and other Cuban exiles to prevent Plaintiff from interfering with the treatment applied to Ana Messer. Plaintiff's mother died on June 30, 1991 (AFF4-2).

43.  In August 1991, Marcus entered in the court records and served Plaintiff with a contradictory and fradulent order of consolidation that granted Plaintiff leave to perfect service of process in Case No. 89-2864 and directed the Clerk to close said case. Defendant Marcus concealed, suppressed and destroyed Plaintiff's motion requesting the consolidation of both actions under Case No. 89-2864, and Plaintiff's motion for clarification of the order of consolidation, and intentionally delayed and

denied Plaintiff's request for a hearing of her motion for clarification of the order of consolidation (AFF6-4,28).

44. After intercepting Plaintiff's communication with Defendant Candela on or about March 3, 1992, and learning of Plaintiff's intent to appeal to the court of appeals for the Eleventh Circuit any adverse action of the Distrct Court, Marcus schemed with Johnson to fabricate a fraudulent record of the case by recording in the docket sheet of Plaintiff's case as orders "granting" Plaintiff's motions to compel the orders that actually denied Plaintiff's motions and by introducing several orders containing intentional false and misleading statements. Defendant Marcus conspired to record in Case No. 90-0230, the Defendants' answers to Plaintiff's complaint filed in Case No. 89-2864 and excluded from the court records the returns of service effected by Plaintiff (AFF6-8).

45. Defendant Marcus conspired with the CANF and Church & Towers and their officials to bring a civil action in the United States District Court for the Southern District of Florida seeking the redelineation of the Dade voting districts, and corruptly influenced Bush to secure the appointment of Defendant D. Graham to said court and the reassingment of the voting rights suit to D. Graham, because Defendant Graham had agreed to enter an order of redelineation in pursuance of a secret plan to transfer the control of the Dade Commission to the Cuban Exile community of Miami, and by awarding lucrative contracts with MDC to the most powerful members of the Cuban Exile and their companies, including Church & Towers, corruptly influence

Church & Towers and its officials to act in furtherance of the conspiracy to injure Plaintiff in her person and property in retaliation for her having attended the court intentionally inflicting on Plaintiff severe emotional and mental distress.

46. In furtherance of John Does I's scheme to inflict on Plaintiff severe and extreme emotional and mental distress, Defendant Bush failed or refused to correct the violation of Plaintiff's rights knowing that Defendant Reagan's wrongful authorization to make Plaintiff's residence, the premises of a United States person as defined by Title 50 U.S.C. §1801(i), the target of electronic surveillance under Title 50 U.S.C. §§1801 et seq., was not given for the purpose of obtaining any foreign intelligence information, but in furtherance of Marcus' and Reno's joint venture with the Dade Officials charged with sexual harassment to invade Plaintiff's privacy in a manner that went beyond all boundaries of common decency (AFF7-80).

47. Defendant Bush refused to terminate the electronic surveillance of Plaintiff's residence knowing that Defendant Marcus had conspired to corruptly influence Defendant Reagan to label Plaintiff's residence "the premises of a foreign power" by reason of Plaintiff's activities protected under U.S. Constituional Amendment 1 in violation of Title 50 U.S.C. §1805(a)(3)(A), and Defendant Marcus was scheming to deny to Plantiff the right to a meaningful access to the courts to petition to redress of her grievances against Dade Officials by reason of the surveillance wrongfully approved by Defendant Reagan and wrongfully extendend by his administration. Defendant

Bush refused to terminate the electronic surveillance knowing that as result of Defendant Reagan's wrongful actions and omissions, and as result of his wrongful actions and omissions, Plaintiff was being deprived of her rights under U.S. Constitutional Amendment 4 to be secure in her person, house, papers and effects against unreasonable searches and seizures, Plaintiff was being deprived of the right of association and communication, of the right of enjoyment and alienation of property, and knowing that the personal injuries and money damages sustained by Plantiff as result of his wrongful actions and omissions would be irreparable (AFF7-116).

48. Upon learning of Plaintiff's intention to appeal to the Court of Appeals for the Eleventh Circuit, Marcus and Reno conspired to secure the elevation of Defendant Ungaro-Benages to the United States District Court by Defendant Bush and schemed with Dade Officials, Rundle and the CANF to corruptly influence Ungaro-Benages to enter into a private agreement to rule against Plantiff. When Plaintiff moved for Marcus' recusal requesting the reassignment of both cases, Case Nos. 89-2864 and 90-0230 to an impartial judge, Defendant Marcus entered an order reassigning Case No. 90-0230 to Defendant Ungaro-Benages to accomplish with the reassingment what Marcus previously sought with the fraudulent order of consolidation, to leave Plaintiff's Title VII claims in oblivion, while Marcus continue to control Plaintiff's action by fradulently concealing himself, acting through said Anglo female judge (AFF6-16).

-70-

49. Acting in clear and complete lack of jurisdicion, Defendant Marcus concealed, suppressed and destroyed material evidence introduced by Plantiff in Case No. 92-1569 and corruptly conspired with Reno, Ginsburg, Davies, Rundle and Fors to introduce in the records of the case affidavits containing the perjured testimony of the Defendants Ron, Celaya, Llano, Perera and Hardiman. Marcus furthered the conspiracy to obstruct the due course of justice by fradulently altering the date of filing on Plaintiff's memorandum, affidavits and exhibits in support of summary judgment and Plaintiff's memorandum and supplemental affidavit in replay of Defendants' opposition to summary judgment with the intent to conceal said material evidence while Marcus corruply influenced Defendant Turnoff to enter a fraudulent report replete of intentional misrepresentations denying that Plaintiff had filed an affidavit and the report of a handwriting expert stating that Ana Messer's signatures on the checks subject of the action were not genuine (AFF6-73).

50. After the defeat of Defendant Bush in the presidential election of 1992, Defendant Marcus conspired with John Does I, John Does II and John Does III and with Dade Officials, Rundle, Church & Tower and CANF to secure Reno's appointment as Attorney General with Defendant Clinton's Administration, and Barkett's appointment for the Court of Appeals Eleventh Circuit, in pursuance of a new scheme designed by Marcus to deprive Plaintiff of the rights protected under the laws and the Constitution of the United States and to inflict on Plaintiff severe and extreme emotional and mental distress by acting

-71-

through an Anglo female in the commission of the wrongs in furtherance of John Does I's vendetta against Alfred Messer Nichols' Cuban female descendants (AFF6-54).

51. While the hearings of Reno's confirmation were taking place before the Senate, Defendant Marcus concealed hundreds of pages of evidence of the pattern of discrimination adopted by Dade Officials and Reno in Dade County and drafted the orders of dismissal and summary judgment signed by Defendant Ungaro-Benages a month after the ratification of Reno's nomination for Attorney General. Defendant Marcus conspired with Defendant Reno and with prosecutors from New York and Washington, D.C. under Reno's control to make Defendant Moore the target of a criminal investigation to coerce the entry of the orders of dismissal of Case No. 92-1569. Without disclosing on the record the facts mandating his recusal, Defendant Moore signed the orders of dismissal drafted by Marcus to secure his exoneration and the termination of the investigation brought against him on charges of corruption (AFF6-57).

52. Defendant Marcus furthered the conspiracy to inflict on Plaintiff severe emotional and mental distress by serving her with fraudulent unsigned orders and memorandums directing her to file and refile briefs and record excerpts that Marcus unlawfully intercepted and excluded from the mails in furtherance of the conspiracy to conceal Plaintiff's evidence, and to secure in the court of appeals the entry of orders affirming the orders signed in the District Court by Ungaro-Benages and Moore by a panel of circuit judges having before them a poor evidence

-72-

of Plaintiff's claims and of the proceedings in the lower court. Defendants Marcus and Reno secured Defendant Barkett's elevation to the United States Court of Appeals for the Eleventh Circuit to secure Barkett's signature in the orders fraudulently drafted by Marcus. After the filing of Plaintiff's affidavit in the United States Court of Appeals in August 1994, stating Plaintiff's concerns about the resolution of her case after the elevation of Reno and Barkett, Defendant Barkett refrained from signing any paper in Plaintiff's case, but corruptly influenced Defendant Black to sign the only orders entered in Plaintiff's appeals that beared the signature of a judge. Plaintiff's appeals were fraudlently dismissed for failure to file record excerpts that were filed by Plaintiff three times in each case (AFF6-61-77).

53. Before conspiring with the CANF, Church & Tower, Reno, Rundle and Dade Officials to secure the defeat of Defendant Bush by Defendant Clinton in the 1992 presidential election, by instigating Ross Perot to run for president in that election, Defendants John Does I, John Does II, John Does III had investigated and gather sufficient evidence to make Hillary and William Clinton the target of a criminal investigation for Hillary Clinton's legal work in the fraudulent real estate development of Castle Grande, William and Hillary Clinton's partnership with the McDougals, the failure of Madison Savings & Loan owned by James McDougal, and Hillary and legal partner's coverup scheme after accepting, without disclosing the conflict of interest, a contract with federal officials to sue Madison's

accountant for the failure of Madison that was caused mainly by the fraudulent millionaire transactions in relation with the Castle Grande project. The indictment against Webster Hubbell, Hillary Clinton's legal partner, steamed from Hillary Clinton's Rose Law Firm billing records, which revealed that Hillary Clinton wrote a fradulent option that was used to deceive federal officials to justify the payment of hundreds of thousands of dollars in commissions (AFF7-153-158).

54. Defendants Hillary and William Clinton ran for the highest office of the Nation, knowing that their involvement in Whitewater and Castle Grande could made them the target of a criminal investigation, indictment and prosecution, but Hillary and William Clinton had been given assurance by John Does I, John Does II, John Does III, Marcus and Reno, acting directly or through Hillary's brother, that they would have no trouble if they acted in furtherance of each scheme designed in South Florida or New York to deprive Plaintiff of her civil and constitutional rights and to inflict on Plaintiff severe emotional and mental distress. When Defendant Starr was appointed to lead the Whitewater grand jury investigation, Defendant Hillary Clinton secured Defendants Reno and Starr's sanction to conceal and cover up the evidence of her wrongdoing, the Rose Law Firm billing records, that were subpoenaed by Defendant Starr in 1994, in return for Hillary Clinton's acts, joining in, and pressing Defendant Clinton to condon Reno's conspiracy with Dade Officials, Rundle, the CANF, Church & Towers and Marcus to deter, impede or deter Plaintiff from attending the

United States District Court by despoiling Plaintiff of her possessions through a fraudulent proceeding in the Florida courts (AFF6-81-97).

55. Upon her arrival at Miami after being nominated for Attorney General by Defendant Clinton, Defendant Reno stated to the media her intent to discharge William Session, FBI Director. Defendants Marcus, John Does I and John Does III conspired with Defendant Reno to discharge Session and to appoint Defendant Freeh, former judge of the United States District Court for Manhattan, as FBI Director, because Freeh had compromised to misuse and abuse the power of the office of FBI Director in furtherance of Defendants Marcus' and Reno's scheme to make Plaintiff's residence the target of video surveillance and to use the information obtained as result of the unconstitutional surveillance to further the pattern of violation of Plaintiff's right of enjoyment and alienation of property by interfering and terminating Plaintiff's legitimate activities to lease or sell her property in furtherance of John Does I's vendetta against Alfred Messer Nichols' Cuban female descendants and John Does I's conspiracy to inflict on Plaintiff severe physical, mental and emotional distress, by causing her to suffer misery, ignominy, embarrassment, humiliations and vexations.

56. Knowing that her exoneration and the termination of the Whitewater grand jury investigation depended on her own wrongful acts, and her capacity to press Defendant Clinton to wrongfully act in furtherance of John Does I, John Does II, John Does III, Marcus and Reno's joint venture with Dade

Officials and the CANF to deprive Plantiff of the rights secured to all Americans under the laws and the Constitution of the United States, Defendant Hillary Clinton, conspired with Defendant Carter to corruptly influence Defendant Clinton to sign Title 50 U.S.C. §§1821 et seq., and Executive Order 12949 in October 1994, and February 1995, respectively, pretending that the unlawful activities of break-ins and burglary of Paintiff's premises that Plaintiff reported to the Court of Appeals for the Eleventh Circuit in August 1994, were authorized by the law and executive order signed by Defendant Clinton that was retroactive to the effective date of Title 50 U.S.C. §§1821 et seq., signed by Defendant Carter on October 25, 1978. Defendants William and Hillary Clinton knew that the tortious acts were undertaken with the intent to retaliate against Plaintiff for her having exercised the right under U.S. Constitutional Amendment 1 to petition for redress of her grievances against Dade Officials, and to deter her from attending the courts of the United States to offer evidence of the violations and the resulting injuries (AFF4-63,AFF7-80).

57. Engaged in the effort to prevent an indictment against the First Lady arising out of the Whitewater grand jury investigation, Defendants Hillary and William Clinton sanctioned Defendants Reno's and Freeh's conspiratorial acts with Defendants Marcus, Rundle, Dade Officials and the CANF to deprive Plaintiff of the rights to the due process and equal protection of the laws in the Florida courts, by appropriating her real property, by despoiling her of her money, by damaging her personal property

and her legal papers with the intent to deter, impede or delay her from attending the courts of the United States, and by making her the target of unlawful arrests, home expulsions and prosecutions in furtherance of the conspiracy to inflict on her severe and extreme physical, emotional and mental pain and suffering(AFF6-81-130).

58. After twelve years conspiring to hinder the advancement of Plaintiff's career, to foreclose her employment opportunities, and to infiltrate and disrupt her personal relations, after seven years interfering with her rights of enjoyment and alienation of property, and after five years defrauding and injuring her in the district court and the court of appeals, Respondents John Does I, John Does II, John Does III, Marcus and Reno conspired with Kislak to bring the action to foreclose her mortgage acting through Barnett. Upon receipt of the counterclaim and third party complaint filed by Plaintiff in Case 94-20188, denying that Barnett was the holder in due course of the mortgage note and joining Kislak as third party defendant, Defendants Marcus and Reno, with Defendant Clinton's sanction, corruptly conspired with Rundle, the CANF and Church & Towers to secure Defendant Farina's appointment as Chief Judge of the circuit courts for the Eleventh Judicial Circuit of Florida and the reassingment of Case No. 94-20188 to Defendant Barr in pursuance of the conspiracy to commit the tortious acts violative of Plaintiff's federally protected rights, acting through an Anglo female(AFF6-86).

59. Knowing of Plaintiff's intent to return to the courts of the United States to seek relief from the orders signed by Ungaro-Benages and Moore, and that Plaintiff had been conducting a legal research in relation with Title 18 U.S.C. §§1961, et seq., Defendant Marcus schemed to further the conspiracy to injure Plaintiff in her person, her property and her legal papers beyond all boundaries of common decency until the last statute of limitations applicable to every law that could be raised by Plaintiff to seek relief expired. Meanwhile Defendant Marcus conspired with Rundle, Roura and the CANF to conceal his intents to injure Plaintiff, by portraying himself as a judge that intended to "help" her with the intent to control Plaintiff's case and to prevent the assignment of Plaintiff's lawsuit to an impartial judge (AFF6-98).

60. Defendants Marcus and Reno, with Defendant Clinton's sanction, conspired with Cuban Officials Castro and Alarcon, with United States Officials Ros-Lehtinen, Diaz-Balart and with members of the Cuban Exile of Miami, including Rundel, Roura, and officials of the CANF and Church & Towers to intimidate and threaten the Cuban Exile of Miami by the utterance of misleading statements about Defendant Clinton's intention to lift the United States embargo on Cuba if Plaintiff did not abandon her legal claims against Dade Officials and Reno to coerce the Cuban Exile to act in furtherance of the conspiracy to deter Plaintiff from attending the courts of the United States (AFF2-46-48).

61.  Defendants Marcus and Reno conspired with the CANF
to use the proceeds or parts of the proceeds from Church &
Towers' lucrative contracts with MDC and with the
telecommunication companies that began to do business with Cuba
under the Torricelli Act signed by Defendant Bush in 1992, to
corruply influence the highest levels of the three branches
of the government of the United States. Defendant Marcus
conspired with the CANF and Church & Towers to funnel huge
contributions to the campaign of Defendant Gingrich in return
of Gingrich's promise to misuse and abuse the power of his office
to promote the Contract with America designed to influence,
by fear of econimic loss, the Cuban Exile of Miami to act in
furtherance of the conspiracy to injure Plaintiff in her person
and property with the intent to deter her from attending the
courts.  Defendants Marcus and Reno conspired with the CANF,
Roura, Rundle, Ros-Lehtinen, Diaz-Balart and other Cuban Exiles
to mislead the Cuban exile into believing that as result of
Plaintiff's efforts to seek justice and relief in the courts
of the United States and her refusal to give up her legal claims,
the authorities of the United States had developed a phobia
against Cubans, and the Contract with America, which terminated
the supplemental payments and welfare assistance to retired
senior citizens that were not United States citizens, was a
manifestation of said phobia.

62. In furtherance of the scheme, sanctioned by Defendants
Hillary and William Clinton, to injure Plaintiff through the
Florida Courts, Defendants Marcus and Reno conspired with

Rundle, Ginsburg, Kraftchick, Clark, the CANF, Church & Towers to corruptly influence Defendants Farina and Barr, and Defendants Barnett, Kislak, Krongold, Lepore, R. Perez, to decide Case No. 94-20188 arbitrarily and in violation of Plaintiff's procedural and due process rights, and Plaintiff rights to the equal protection of the laws, by entering a fraudulent judgment of foreclosure without a trial, and the fradulent orders of disbursement of $25,407.46 deposited in the court register by concept of surplus and insurance proceeds in furtherane of the scheme designed by Defendant Marcus when Plaintiff was buying said house in 1987, to appropriate Plaintiff's real property and all equity that belonged to Plaintiff and she was the only person entitled to receive.(AFF6-112).

63. In furtherance of the pattern of violations of Plaintiff's rights to a meaningful access to the courts adopted by the officers of the United States District Court for the Southern District of Florida as result of the corrupt influence exercised by Defendants Marcus and Reno, Defendant Cedeno assigned to Marcus' calendar Case No. 95-2368 filed by Plaintiff on October 26, 1995, seeking relief from the orders entered in Cases Nos. 90-0230 and 92-1569 by Defendants Ungaro-Benages and Moore, and moving for an injunction against enforcement of the collusive judgment of foreclosure entered in Case No. 94-20188. Defendants Marcus and Reno scheamed to conceal the evidence filed by Plaintiff, secured the entry of an order denying Plaintiff's motion for injunction signed by Defendant Ungaro-Benages and fraudlently predated to interfere with the

-80-

hearing of the motion requested by Plaintiff. Defendant Marcus entered an order of reassignment also fraudulently predated to prevent Plaintiff to argue that Defendant Ungaro-Benages' action was taken without jurisdiction, and schemed to deny Plaintiff's motion for recusal of Ungaro-Benages acting through Defendant Roettger, who since at least November 1992, knew of Marcus' personal prejudice against Plaintiff, and knew of Marcus' scheme with Reno and Dade Officials to secure Ungaro-Benages' elevation to the United Stats Distrct Court to deprive Plaintiff of her rights acting through Ungaro-Benages (AFF6-105).

64. Meanwhile, Rundle, Dade Officials, Taylor, the CANF, Church & Towers, Roura, Ron and Nancy, with Defendants Marcus and Reno's sanction, conspired to retaliate against Plaintiff for her having attended the courts of the United States. By instigating Plaintiff's arrest on November 12, 1995, five days after filing a motion to disqualify Ungaro-Benages from Case No. 95-2368, and Plaintiff's arrest on February 25, 1996, four days after dismissing without prejudice Case No. 95-2368 as result of the denial of her motion by Defendant Roettger, Defendants Marcus, Reno, Roettger and Ungaro-Benages, acting through Dade Officials, unlawfully retaliated against Plaintiff to the pain of her mind and body in pursuance of John Does I's conspiracy to inflict on Alfred Messer Nichols' cruel and unusual punishment and severe emotional and mental distress (AFF6-113).

65. In furtherance of the scheme to deny to Plaintiff a meaningful access to the courts, Defendants Marcus and Reno schemed with Rundle, Taylor, Cohen, Venzer and Brummer to coerce

Plaintiff's guilty plea or to secure Plaintiff's conviction by knowingly using the perjured testimony of the arresting officer, while the court refused to rule on Plaintiff's motion to dismiss the charges that were never traversed by the State, and is still pending before the court while the false charges against Plaintiff remain in the court records (AFF6-120-131).

66. Despite of the evidence of the retaliation endured by Plaintiff as result of her refusal to proceed before Defendant Ungaro-Benages in Case No. 95-2368, Defendant Marcus conspired with Defendant Cedeno to assign to Ungaro-Benages Case No. 96-2585 that Plaintiff intended to file on September 10, 1996, and to conceal the name of the judge that would exercise jurisdiction when Plaintiff returned to the court on October 30, 1996. Acting in complete absence of jurisdiction and clear usurpation of the judicial power, exercising an authority that is unconstitutional or is exercised in unconstitutional manner, Defendants Marcus and Reno conspired with Defendants Taylor, Rundle, the CANF and Roura to corruptly influence Deeb and the officers under Taylor's control that evicted Plaintiff on November 24, 1995, to unlawfully appropriate the legal papers gathered by Plaintiff after two week doing a legal research at the University of Miami (AFF3-56-61,AFF6-109-112).

67. After impeding Plaintiff from proceeding with her filing on October 30, 1996, Defendants Marcus, Reno, Rundle, Dade Officials and the CNAF, designed a scheme to unlawfully appropriate the binders of exhibits, the affidavits, and the complaint prepared by Plaintiff after three months working in

the law library of the same University. In pursuance of the scheme, Defendants Marcus and Reno conspired with Rundle, Taylor and Warshaw to secured Defendant Diaz's release from jail and instigated said landlord to forcibly enter Plaintiff's efficiency and to steal or permit a third party to steal Plaintiff's legal papers together with more than $2500 of Plaintiff's tangible property (AFF3-69-82).

68. When the entry of the fraudulent judgment of foreclosure and the fraudulent orders of disbursement in Case No. 94-20188 did not compel Plaintiff to seek a settlement of her claims against Dade Officials and Reno, in pursuance of an unlawful scheme in which all the Defendants participated, Hillary Clinton was compelled to produce her Rose Law Firm billing records that Hillary Clinton had been two years concealing with the sanction of Defendants Marcus, Starr and Reno, who did not scheme to bring the Whitewater investigation with the intent to enforce the laws against the Clintons, but to manipulate and coerce Defendant Clinton to act in furtherance of each scheme designed in South Florida and New York to deprive Plaintiff of her civil and constitutional rights. After being subpoenaed to testify before the grand jury to her billing records, Defendant Hillary Clinton, acting directly and through her brother, with Defendant Clinton's sanction, schemed with Reno, Rundle and Dade Officials to further the pattern of retaliation against Plaintiff by making her the target of unlawful arrest and home expulsions. Hillary Clinton, who had been three years evading an indictment on charges of fraud and obstruction of justice for her

participation on the fraudulent millionaire transactions in
Castle Grande, in an effort to continue to evade an indictment
against her, conspired with Reno, Rundle and Dade Officials
to influence Cohen and Venzer to secure Plaintiff's conviction
by knowingly using the perjured testimony of the police officer,
in pursuance of the conspiracy to deter Plaintiff from attending
the courts of the United States (AFF6-127-139).

    69. In spite of the "material" evidence of fraud and
obstruction of justice accumulated by Defendant Starr against
Hillary Clinton, Defedants Hillary and William Clinton secured
the re-election in 1996, by adopting the new scheme designed
in South Florida and New York to deprive Plaintiff of the rights
secured to all Americans under the laws and the Constitution
of the United States by arbitrarily vesting Cuban Officials
Officials, Castro and Alarcon, with authority to settle
Plaintiff's civil rights action duly instituted in the courts
of the United States for violation committed in territory of
the United States as  result of the tortious acts and ommisions
of a Democrat President, Carter, as result of the tortious acts
and omissions of two Republican Presidents, Reagan and Bush,
that were  in great part influenced by the Democrat State
Attorney for Dade County that Hillary Clinton pushed up to
Attorney General, and as result of the tortious acts and omission
of another Democrat President, Clinton, who pressed by the Fisrt
Lady, undertook the wrongful acts with the calculated intent
to cause the deprivation of Plaintiff's rights and the resulting
injuries, because to cause the personal injuries and loss of

property that Plaintiff sustained throughout the eight years of President Clinton administration was the condition that said President and First Lady knowingly accepted before runnig for office in 1992, to secure the re-election in 1996, and to secure their exoneration in the Whitewater and Lewinsky investigations.

70. Defendants John Does I, John Does II, John Does III, Reno, Marcus, Dade Officials, Rundle, the CANF and Church & Towers conspired to funnel huge contributions to the Democrat party presidential campaign to secure Defendant Clinton re-election in 1996, and with it the execution of the new scheme to deprive Plaintiff of her civil and constitutional rights acting through Defendant Albright, appointed Secretary of State by Defendant Clinton for the second term of his administration in pursuance of John Does I's vendetta against Alfred Messer Nichols' Cuban female descendants. In April 1997, after the conviction of the McDougals, when James McDougal began to cooperate with Defendant Starr, and Defendant Starr sought the extension of the Whitewater investigation, Defendant Hillary Clinton, being again under the threat of an indictment, sanctioned the conspiracy to fabricate the scandal of Defendant Clinton's affair with Lewinsky and compromised to use her influence as First Lady, acting directly and through Defendant Albright, to secure Cuban Officials' approval of the outcome fraudulently predetermined in Plaintiff's case. In pursuance of the plan to influence Cuban Officials' acts, while Defendant Clinton approved the humanitarian assistance to Cuba, Defendant

Albright would communicate to Cuban Officials defamatory information about Plaintiff's case to mislead said officials as to the merits of her claims (AFF7-165-170).

71. When Plainitff was demonstrating before the United States Courthouse in July 1995, with a permit issued by Cesar Odio, City Manager, despite Mayor Clark's opposition, fearing Odio could secure a job for the Plaintiff with the city of Miami in or about July of 1995, which would have prevented the foreclosure of Plaintiff's mortgage interfering with the plan to coerce Plaintiff's reinstatement with MDC after being despoiled of her possessions, Defendants Marcus and Reno conspired with Defendants John Does II, Scott and Udolf, and with local officials Rundle, Clark and Surana, to design Operation Greenpalm with the intent to entrap city manager Cesar Odio and to coerce Odio's resignation (AFF2-50). After compelling Odio's resignation in or about September 1995, Defendants Marcus, Reno, Scott and Udolf conspired to influence Carollo, City Mayor, to secure Merret Stierheim's appointment as Interim City Manager, and with Stierheim, the appointment of an oversight board after declaring the city in state of financial emergency in pursuance of a new scheme designed to secure Plaintiff's reinstatement for MDC by indirect and circuitous methods, by compelling Plaintiff to accept a job with the city of Miami, approved by Cuban Official, before plotting with city officials and the oversight board the merge of the city with MDC.

72. When Plaintiff filed Case No. 98-2517 requesting the issuance of a writ prohibiting Clinton and Albright to vest

Cuban Officials with authority to decide Plaintiff's civil rights action pending before the courts of the United States, Plantiff suspected that the scandal unfolded with the dissemination of Lewinsky's testimony contained in Defendant Starr's report to Congress had been planned to influence the resolution of Plaintiff's case by Cuban Officials without her participation in pursuance of a covert plan that Plaintiff ignored. Defendant John Does I, John Does II, John Does III, Marcus, Reno, Rundle, Dade Officials, the CANF, Church & Towers that designed the scheme to secure the resolution of Plaintiff's case by Cuban Officials as a condition to terminate the Whitewater probe, conspired with Defendants Starr, Gingrich, Hyde, Ros-Lehtinen, Diaz-Balart, Burton to influence the House of Representatives to vote to impeach Defendant Clinton (AFF6-189,AFF7-170).

73. After the impeachment of Defendant Clinton, Defendant Hillary Clinton conspired to secure John Does I, John Does II, John Does III, Marcus, Reno, Starr, Ray, the CANF and Church & Towers' support to her bid for the Senate from the state of New York in return for a promise to use her influence as Senator to further the scheme to deprive Plaintiff of her civil and constitutional rights acting through Cuban Officials after the termination of Defenfant Clinton second term in the White House. Defendant Hillary Clinton compromised to continue to exercise her influence as First Lady to the end of Clinton Administration to impede the discharge of the President's duties preventing further violations of Plaintiff's civil and constitutional rights after Defendant Clinton's acquittal in the Senate (AFF7-188).

-87-

74. After twenty seven years conspiring to maintain Castro in power in Cuba by funneling huge amounts of money to the Cuban government through the USSR, John Does I conspired with Defendants Reagan and Bush to corrutply influence Soviet President Mikhail Gorbachev to cause the collapse of the Soviet Union with the intent to isolate Cuba, not to remove Castro from power, because simultaneously, John Does I conspired to pass the Torricelli Act to provide Castro, through the American telecommunication companies that began to do business with Cuba, with the funds that Castro needed to continue in power. By isolating Castro after the collapse of the USSR, John Does I secured the execution by Cuban Officials of their part of the scheme designed to deprive Plaintiff of the right to a meaningful, adequate and effective access to the courts of the United States guaranteed to all Americans under U.S. Constitutional Amendment 1, by arbitrarily approving, without knowledge of the laws of the United States, with no knowledge of the facts and the evidence supporting Plaintiff's claims, and without Plaintiff's participation, the outcome fraudulently premeditated of the civil rights action duly instituted by Plaintiff in the United Stats District Court for the Southern District of Florida that was pending before Defendant Marcus' court (AFF6-1,28, AFF7-152).

75. The Torricelli Act was also design to influence Defendants Church & Towers and its officials, who began to receive lucrative contracts with the same telecomunication companies that were doing busienss with Cuba under the Torricelli

Act. In pursuance of John Does I's conspiracy to inflict on Plaintiff severe emotional and mental distress, Defendants John Does II, John Does III, Marcus and Reno conspired with Defendants Church & Towers and CANF to use part of the proceeds from the lucrative contracts with MDC awarded Church & Towers after the redelineation of the Dade voting districts (¶45), and from the lucrative contracts awarded Church & Towers under the Toricelli Act to corruptly influence the highest levels of the three branches of the government of the United States to act in furtherance of the scheme to deprive Plaintiff of her civil and Constitutional rights. In pursuance of the scheme, Defendants Church & Towers and CANF funneled huge amounts to the campaign of Defendants Helms and Burton in return for a promise to pass the Helms-Burton Act designed to deprive the President of the United States of the power given the Executive by the Constitution of the United States to establish foreign policy. The Helms-Burton Act deprived the President of the power given him by the Constitution of the United States to terminate the United States sanctions on Cuba and transferred that power to Congress (AFF6-207).

76. Defendants John Does II, John Does III, Marcus, Reno, Ros-Lehtinen, Diaz-Balart, F. Hernandez, A. Hernandez, Roura and Rundle conspired to communicate to the Cuban Exile that the lift of the embargo on Cuba was a condition to allow the exercise of Plaintiff's rights secured to all Americans under the laws and the Constitution of the United States, and that Defendant Clinton would lift said embargo if Plaintiff did not

give up her claims, to instigate the Cuban Exile's opposition to the exercise of my rights to attend the courts of the United states with the intent to make me the target of further retaliatory acts within the Cuban community aimed at injuring me in my person and my property and to inflict on me severe emotional and mental distress. Meanwhile, the CANF and Church & Towers corruptly influenced Defendant Clinton to sign the Helms-Burton Act that Clinton had rejected, and offered Presidnet Clinton financial and political support to his '96 campaign for re-election, tin return for a promise to use the influence of the office of President of the United States to further the deprivation of Plaintiff's civil and constitutional rights by vesting Cuban Officials with authority to act as my guardian ad litem with authority to settle my civil rights actions before the courts of the United States.

77. Defendant Starr's appointment to lead the Whitewater investigation, that was extended for seven years and cost the American people over $60 million, was made by a court in 1994, in pursuance of the Ethics in Government Act, that switched the responsibility to appoint outside counsels to investigate misconduct by top government officials from the Attorney General to a panel of judges, and released the Independent Counsel from the procedural, budgetary and jurisdictional constraints imposed by the Justice Department. In June 1999, Congress, that every five years had reauthorized the Ethics in Government Act, let it die acknowledging that it damaged the principles of separation

of power and constitutional government by depriving the President
of the power given him by the Constitution of the United States
to run the executive part of the government. After expiration
of the Independent counsel law, Defendant Starr, who retired
in October 1999, after securing the appoinment of a replacement,
Defendant Ray, continued to conspire with Defendant Ray to harass
and 'intimidate Defendant Clinton, by threatening Clinton that
he would be indicted after the completion of his second term
in the White House in relation with the Lewinsky investigation
in pursuance of the scheme to deter Defendant Clinton from
discharging the duties of his office to preserve, defendant
and protect the Constitution of the United States terminating
the violation of Plaintiff's civil and constitutional rights.
The Ethics in Government Act was enated in 1978, and reauthorized
every five years by Congress in pursuance to John Does I's
conspiracy to limit the authority of the Executive, and to
prevent or deter the President, by harassment, intimidation
and threats, from terminating the unconstitutional electronic
surveillance of Plaintiff, her mother and their premises,
pursuant to Title 50 U.S.C. §§1801 et seq., also enacted in
1978 in furtherance of John Does I's conspiracy to inflict on
Alfred Messer Nichols' Cuban female descendants cruel and unusual
punishment, and severe and extreme emotional and mental distress.
(AFF7-57,153).

78. In August 1985, Defendant Marcus secured his elevation
to the United States District Court in return for a promise
to misuse and abuse the power of his judicial office to obstruct

the due course of justice and to deprive Plaintiff of the right to the equal access to the courts of the United States. Since 1989, that Plaintiff's civil rights action, Case No. 89-2864, was instituted in the United States District Court, Defendant Marcus has schemed with other court officers, Defendants Cedeno, Johnson, Ungaro-Benages, Roettger, King, D. Graham, Turnoff, Moore, Barkett, Black, Nesbitt, Davis, Garber, Highsmith, Zlock to deprive Plaintiff of the right to attend the courts to petition for redress of her grievances against Dade Officials and Reno. In September 1997, after the failure of the scheme designed to secure in the court of appeals the entry of fradulent orders affirming the ruling entered in Cases Nos. 90-0230 and 92-1569 by Defendants Ungaro-Benages and Moore, Defendants Marcus and Reno, knowing that since October 1995, Plaintiff was seeking relief in the United States District Court from Ungaro-Benages' and Moore's orders, conspired with Defendants Ros-Lehtinen and Graham to secure Marcus' elevation to the United States Court of Appeals for the Eleventh Circuit in furtherance of the scheme to secure the affirmation of Ungaro-Benages' and Moore's orders by a panel of circuit judges corrutply influenced by Marcus and Reno (AFF6-76).

79. In pursuance of the scheme, Reno secured Marcus' nomination to the Court of Appeals by Defendant Clinton in September 1997, while Ros-Lehtinen lauded Reno's "impartiality in her prosecutorial decisions" that Ros-Lehtinen said "were never influenced by politics", and Graham introduced Defendant Marcus to the Senate panel as a "highly skilled prosecutor and

outstanding judge." (AFF7-129). Knowing of Marcus' personal prejudice against Plaintiff, and said judge lack of impartiality and independence, Defendants Reno and Graham delayed the official investiture of Defendant Marcus until the last week of January 1998, after the filing of Plaintiff's Case No. 98-0087 that did not name Marcus as party defendant because Plaintiff ignored Defendant Marcus' participation in the conspiracy to hinder her professional advancement, in the scheme to entrap her after her having complained of the sexual harassment of HUD, in the scheme to remove her case from the district court in 1993, where the record was replete of evidence calling for a trial on the merits, and to defraud her, to injure her case and to inflict on her severe emotional and mental distress through a fraudulent appeal process (AFF6-180).

80. In 1997, when Defendant Davis was appointed Chief Judge of the United States District Court for the Southern District of Florida, corruptly influenced by Defendants Marcus, Reno, Rundle, Dade Officials and the CANF, Defendant Davis adopted the scheme to deprive Plaintiff of the right to a meaningful access to the courts by securing the disposition of Plaintiff's claims by Cuban Officials upon the institution of Plaintiff's civil rights action in said court, and with the termination of Plaintiff's case, the termination of the Whitewater and Lewinsky Investigation and the exoneration of Hillary and William Clinton. Defendant Davis joined in the conspiracy, or sanctioned Marcus' conspiracy with Defendants

Scott, Davenport, Garber and Smith to prevent Plaintiff from receiving answers to her discovery requests served on Defendant Cedeno on July 15, and September 9, 1998, depriving Plaintiff of the right to learn, and obtain information through discovery, of material facts giving raise to her cause of action, and to arbitrarily close the case in violation of the minimum requirements of the due process of the laws secured to all Americans under U.S. Constitutional Amendment 5 (AFF6-201-208).

81. After the filing of Case No. 98-2517 by Plaintiff on October 26, 1998, raising for first time in her pleadings allegations that Defendant Marcus had been appointed for South Florida in 1982, in pursuance of John Does I and John Does III's conspiracy to deprive Plaintiff of her civil and constitutional rights, and Defendant Marcus was since conspiring with Reno, Dade Officials and the Cuban Exile to inflict on Plaintiff cruel and unusual punishment and severe emotional and mental distress in furtherance of John Does I's vendetta against Alfred Messer Nichols' Cuban female descendants, while Defendants Marcus, Starr, Ray, Gingrich, Ros-Lehtinen, Diaz-Balart, Burton, Hyde, the CANF and Church & Towers furthered the conspiracy to deter Defendant Clinton from discharging the duties of his office by securing his impeachment in the House, Defendants Marcus, Reno, Davis, Johnson, Ungaro-Benages, Roettger, King, D. Graham, Highsmith, Moore, Zlock and Davis furthered the scheme to deny to Plaintiff the right to a meaningful, effective and adequate access to the courts, intentionally inflicting on Plaintiff

with their tortious acts and omissions, severe emotional and mental distress.

82. In pursuance of the scheme to interfere with the exercise of Plaintiff's right under U.S. Constitutional Amendment 1, Defendants Marcus and Reno, with the sanction of Defendant Hillary Clinton who was compromised to prevent the resolution of Plaintiff's claims under Defendant Clinton Administration, conspired with Defendants Cedeno, Davis, King, Moore, Highsmith, D. Graham to enter several orders of recusal of said judges in the record of Case No. 99-1618 filed by Plaintiff on June 10, 1999, to compel the transfer of the case to the court of Fort Lauderdale in pursuance of the scheme to conceal and cover up the evidence of the pattern of violations of Plantiff's civil and constitutional rights, and the involvement of Federal Officials in the joint venture with Dade Officials to cause the deprivations of Plaintiff's federally protected rights and the resulting injuries and loss of property sustained by Plaintif (AFF6-224-230).

83. After the fraudulent assignment and reassignments of the case to six different judges, all disqualified to exercise jurisdiction of Plaintiff's claims, Defendant Davis reassigned Case No. 99-1618 to Defendant Zlock, who, corruptly influenced by Defendants Marcus, Reno and Davis, himself, had agreed to enter an arbitrary order of dismissal without prejudice without having even read the complaint filed by Plaintiff. The order of dismissal without prejudice, arbitrarily entered in Case No. 99-1618 on August 30, 1999, was another corrupt effort of

the court officers influenced by Defendant Marcus to prevent Plaintiff from pursuing her claims under Title 18 U.S.C. §1964 for Dade Officials' pattern of sexual harassment and retaliation throughtout her employment with MDC until her termination on June 12, 1989, that were untimely if Plaintiff had to refile the case. The order of dismissal without prejudice arbitrarily entered in Case No. 99-1618 on August 30, 1999, before expiration of the 120 days provided by Rule 4(m), Fed. R. Civ. P., to effect service of process on the defendants, was moreover entered to interfere with Plaintiff's plan to travel to Washington, D.C. to present her administrative claim in the first week of September before returning to Miami to effect service of process on the defendants (AFF6-225).

84. Upon receipt of the complaint filed by Plaintiff in Case No. 99-1618, Defendants Marcus and Reno conspired with Defendants Penelas, Steirheim, Rundle, Roura and other members of the Cuban Exile to obtain, in an emergency election, the voters' approval to increase the sales tax in MDC to 7.5% in pursuance of a project that the promoters intended to sell to the voters as a project to improve the transit system and was actualy a project to create an $85 million fund naming as beneficiaries members of the press of Washington, D.C, and New York, in furtherance of a new scheme designed by the Defendants to corrutply influence some members of said press to act in furtherance of the conspiracy to injure Plaintiff in her person and property, to intercept her mail, to interfere with her activities, her efforts to repair her car, to secure a license

tag, to rent a room, to order some office suplies (AFF6-300-350, AFF7-192). Knowing that Plaintiff opposed the tax increase and that she intended to distribute some pamphlets in MDC alerting the voters to vote against Penelas' project, Defendants Marcus, Reno, Albright, Hillary Clinton, Rundle, Martinez plotted to join other Democrats of South Florida in the conspiracy to deter Defendant Clinton, who had influenced to prevent Plaintiff's landlords, Alvarez in June 1998, and Izquierdo in April 1999, from wrongfully evicting Plaintiff, from taking any action to interfere with the conspiracy to injure Plaintiff in her person and property to impede or delay her from proceeding in Case No. 99-1618 and from traveling to Washington, D.C. (AFF6-230).

85. Meanwhile, a new scheme to corruptly influence the Cuban Exile to act in furtherance of the conspiracy to injure Plaintiff in her person and property with the intent to deter, prevent, impede or delay Plaintiff from attending the court. In pursuance of the scheme, five days after the filing of Case No. 99-1618, Defendant King entered an order in a civil lawsuit brought by the Cuban Exile group known as Brothers to Rescue seeking damages for the downing of four members of the group by Cuban forces in Febuary 1996, authorizing Brothers to Rescue's attorneys to enforce the $187 million judgment entered in 1997, in spite of the petition for injunctive relief filed in the Court of Appeals for the Eleventh Circuit by the American companies that were doing business with Cuba under the Torricelli Act. Defendant King's order allowed said attorneys to collect $5 million in June 1999, and $39 million in April 2000, and

-97-

was designed to corruptly influence, by bribery, the Cuban Exiles that for years have acted in furtherance of the unlawful conspiracy to retaliate against Plaintiff, including Defendant Roura, who did not hide her expectations about the "millions' that they would receive as result of King's order (AFF6-253).

86. After the filing of Case No. 99-1618, the scheme designed or sanctioned by the judges for the Southern District of Florida and other federal officials from the three branches of the government of the United States, including Reno, Albright, Hillary and William Clinton, Freeh, Scott, Ros-Lehtinen, Diaz-Balart, with complicity of Dade Officials, including Rundle, and the Cuban Exile, including the CANF, Church & Towers and Roura, calculated to impede Plaintiff from attending the court, was furthered beyond all boundaries of common decency. The premises that Plaintiff was renting from Izquierdo were entered without Plaintiff's consent, and the printing unit of Plaintiff's office machines deliberately damaged to prevent Plaintiff from printing the papers that she had stored in diskettes and she needed to file in Case No. 99-1618, and to present in support of her Administrative Claim to the agencies of the government of the United States involved in the commission of the tortious acts and omissions that have caused the injuries and loss of property sustained by Plaintiff (AFF6-231-246).

87. In furtherance of the unlawful scheme to impede, prevent or deter Plaintiff from proceeding in any forum before conclusion of the second term of Defendant Clinton Administration designed or adopted by Defendants, Marcus, Reno, Starr, Ray, Hillary

Clinton, Albright, Ros-Lehtinen, Diaz-Balart, the CANF, Church & Towers, Roura, Rundle and other Dade Officials and Cuban Exiles, by injuring Plaintiff in her person and property, all her efforts to repair her office machine were worgfully interfered, her second machine was damaged and the truck containing all her office machines, her diskettes, her affidavits, and the binders of exhibits needed by Plaintiff to substantiate her claims was stolen on November 24, 1999, and wrongfully hidden. As result of the Defendants' tortious acts and omissions Plaintiff was impeded from proceeding in Case No. 99-1618, and with the appeal from Defendant Zlock's order, Plaintiff's plan to travel to Washington D.C. was delayed seven months while Plaintiff secured a place where to room and where to re-type hundreds of pages of affidivits and re-do binders with thousands of documents, and Plaintiff was caused severe and extreme emotional and mental distress (AFF6-289-291).

88. The meaning of the scheme designed to secure the settlement of Plaintiff's civil rights action by Defendants Castro, Alarcon, Robaina, Perez Roque, or any other Cuban Official acting under their direction and control, is that Cuban Officials intend to act as, and would be vested by United States Officials with authority to act as Plaintiff's guardian ad litem in the courts of the United States. The appointment of a guardian ad litem pursuant to Rule 17(c), Fed. R. Civ. P., by a court of the United States requires a prior adjudication of insanity or incompetence. Plaintiff has never been adjudged incompetent by a court or tribunal of the United States. Plaintiff was

never adjudged incompetent by any Cuban court or tribunal before leaving Cuba in October 3, 1978. Any adjudication of incompetence obtained by Officials of the United States from the Cuban Officials has been or will be obtained by fraud, in pursuance of the concerted corrupt effort of both governments to secure their own exoneration and is accordingly, VOID and NULL. Any adjudication of incompetence obtained by Officials of the United States from the Cuban Officials has been or will be obtained in furtherance of the joint venture establish by both governments more than forty years ago to deprive the woman of Alfred Messer Nichols's Cuban family of the basic rights and fundamental freedoms guaranteed to all persons by international law, and the rights secured to all Americans under the laws and the Constitution of the United States. Any adjudication of incompetence obtained by Officials of the United States from the Cuban Officials has been or will be obtained in furtherance of John Does I's vendetta against Alfred Messer Nichols' Cuban female descendants, for Alfred Messer Nichols' decision to marry a Cuban woman, and to take Clarita, the daughter that he had with an Anglo woman in the United States to live with him and his Cuban wife in Cuba.

89. Defendants have acted so far beyond the scope of their authority that they could not have been exercising a function which could be called discretionary, therefore, the United States in this suit brought against it by Plaintiff could not claim exception from liability under discretionary function exception from waiver of tort liability. The Defendants' tortious acts

Case 1:01-cv-01669-TPJ   Document 1   Filed 07/19/01   Page 90 of 142

have been undertaken with the intent to inflict on Plaintiff severe or extreme emotional and mental distress, and to cause the personal injuries and loss of property that Plaintiff has sustained. Plaintiff's claims for intentional infliction of severe emotional or mental distress, invasion of privacy, trespass, conversion and civil conspiracy are recognized under Florida Law as well as under Washington Law and Defendant United States is liable for the personal injuries and loss of property caused by the wrongful acts and omissions of their officers and employees in the same manner and to the same extent as a private individual under like circumstances.

90. On May 31, 2000, Plaintiff presented an Administrative Claim under the federal Tors Claim Act, Title 28 U.S.C. §§2671 et seq., and 1346(b), to the Office of the United States Attorney for the Southern District of Florida and to the United States District Court for the same district. With the written claim, Plaintiff presented six hundred thirty nine pages of affidavits. Between June 19 and 22, 2000, Plaintiff presented an Amended Administrative Claim pursuant to the same statute to the same agencies in Miami, together with Affidavits Nos. 1 through 7, Appendixes Nos. I through IV and Supplemetal Appendixes Nos. I through VII. Upon receipt of Plaintiff's claim, Defendants Marcus, Reno conspired to appropriate, conceal and destroy Plaintiff's claim and the twelve boxes of documents that Plaintiff presented with it to nine agencies of the government of the United States in in Miami, Atlanta and Washington, D.C. (AFF6-258,259, 351-354).

-101-

91. On July 3, 2000, in her way to Washington, D.C., Plaintiff presented to the Court of Appeals for the Eleventh Circuit with the same Amended Administrative Claim and supporting affidavits and appendixes. Between July 10 and July 13, Plaintiff presented the Amended Administrative Claim, affidavits and exhibits to the Office of the Chairman of the Judiciary Committee of the House, Representative Henry Hyde, to the Department of Justice, to the Department of State, to the Office of the Independent Counsel, and to the Executive Office of the President of the United States. After several attempts to obtain a physical address of the Director of the CIA to deliver her Amended Administrative Claim, the officer that answered the CIA telephone number appearing in the Virginia directory, provided Plaintiff with an address where the officer said Plaintiff could deliver her Claim: 930 Dolly Madison Boulevard, McLean, Virginia. When Plaintiff appeared at said address five hours later to present her papers, Plaintiff was subjected to a harassment, humiliations and vexations that were calculated when the officer gave the address to Plaintiff over the phone. On every previous occasion that Plaintiff called said number, Plaintiff had been told that she had to mail her papers and all officers had refused to provide Plaintiff with a physical address. On July 14, 2000, after more than two hours humiliating and harassing the Plaintiff, the officers of the CIA refused to accept her claim, and again told her that she had to mail the papers. Plaintiff was given a warning falsely stating that Plaintiff had entered the compound without proper authorization (AFF6-295-300).

-102-

92. The Departments of the United States named in Section II of the Amended Administrative Claim presented by Plaintiff are included in the definition of Federal Agency given by the Federal Torts Claim Act ("FTCA"), Title 28 U.S.C. §2671, that provides: "...the term 'Federal Agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."

93. Defendants John Does I, John Does II, John Does III, Marcus, Reno, Reagan, Bush, Carter, Clinton, Freeh, Albright, Starr, Ray, Udolf, Helms. Graham, Torricelli, Gingrich, Hyde, Burton, Ros-Lehtinen, Diaz-Balart, Cedeno, King, Roettger, Johnson, Ungaro-Benages, D. Graham, Moore, Turnoff, Nesbitt, Garber, Zloch, Davis, Barkett and Black are employees of the government of the United States and were acting within the scope of their offices for purposes of Title 28 U.S.C. §§2671 and 1346(b) when they committed the tortious actions or omissions that resulted in claimant's injuries and loss of property.

94. Defendants' wrongful acts and omissions that deprived Plaintiff of the right to the equal access to the courts of the United States secured under the freedom of speech clause of U.S. Constitutional Amendment 1 and the due process clause of Constitutional Amendment 5, that deprived Plaintiff of right to pursue a profession secured under U.S. Constitutional Amendment 5, that deprived Plaintiff of her property rights

-103-

secured under U.S. Constitutional Amendment 5, that deprived Plaintiff of the right to be secure in her person, house, papers and effects against unreasonable searches and seizures guaranteed by U.S. Constitutional Amendment 4, and of the right of association and communication secure under U.S. Constitutional Amendment 1, cannot be discretionary for purpose of FTCA immunity. Defendants' conduct cannot be discretionary for purpose of FTCA immunity, because it violated the Constitution of the United States. Discretionary function exception to FTCA [28 U.S.C. §2680(a)] liability does not bar this action against Defendant United States brought by Plaintiff, an American citizen, where Defendants' conduct did not involve normal regulatory activities or weighing of policy factors within scope of proper governmental power, but rather, something which went beyond constitutional powers of Government and seriously violated constitutional rights of Plaintiff.

95. Pursuant to Title 28 U.S.C. §2677, the Attorney General may settle any claim for money damages against the United States for injury or loss of property or personal injury caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment under circumstances where the United States, if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. Acceptance of such settlement shall be final and conclusive on the Plaintiff and shall constitute a complete release of any claim against the United States and against the employee

of the government whose act or omission gave rise to the claim, by reason of the same subject matter **only** if it is accepted by Plaintiff, Ada Ron-Messer. No settlement shall be final and conclusive on the Plaintiff when is procured by means of fraud, that is when acceptance is made by a third party arbitrarily vested with authority to do so, and not by Plaintiff.

96. By bringing this action against Defendant United States Plaintiff shall not be barred from bringing Bivens action against the Defendants personally as authorized by Title 28 U.S.C. §2679(b)(2) for violation of her rights secured under U.S. Constitutional Amendment 1, 4, 5, 8 and 14, pursuant to Title 42 U.S.C. §§1981, 1983 (for their actions in concert with officials of Dade County and City of Miami) and 1985(1), (2) and (3), pursuant to Title 50 U.S.C. §§1801, et seq., and pursuant to Title 18 U.S.C. §1961, et seq., for Defendants' activities outside the scope of their employment that are indictable under Title 18 U.S.C. §§1503, 1510, 1512, 1513, 1951, 891 and 1341.

97. Although Plaintiff's allegations that Defendants Marcus and John Does II conspired to entrap her may amount to a malicious prosecution claim, such a claim against federal investigative or law enforcement officer is not barred by the exclusions of subsection (h) of §2680, because subsection (h) of §2680 specifically allows such claims or omission by federal investigative or law enforcement officers. Intentional torts proviso in FTCA permits malicious prosecution claim against Government whenever claim alleges that investigative or law

enforcement officer, acting in his or her investigative or law enforcement capacity, committed acts constituting malicious prosecution regardless of whether malicious prosecution claim arouse directly out of search, seizure or arrest. The willful and malicious misconduct exhibited by the Defendants Marcus, Reno, and John Does II is actionable under FTCA. Congress has specifically provided that the Act shall apply to the intentional torts of federal law enforcement officers.

98. Furthermore, Plaintiff alleges that Defendants Marcus and John Does II conspired with Dade Officials and Reno to entrap Plaintiff with the intent to inflict on her severe emotional distress by coercing her reassignment as Rosenbaum's probationary subordinate, and by denying her a permanent status in every department of MDC, imposing her unlawful demotions up to the termination of her employment as result of her refusal to accept the reassignment for Rosenbaum's staff. Even though Defendants Marcus' and John Does II's conduct may have involved malicious prosecution, Plaintif's claim is not barred by intentional torts exception to 28 U.S.C. §§2678 and 1346(b) where tortious wrong Plaintiff asserts is intentional infliction of emotional distress.

99. Claim for invasion of privacy in connection with alleged interception of Plaintiff's oral, wire, telephone and written mailed communications did not fall within intentional torts exception to waiver of sovereign immunity provided by Title 28 U.S.C. §2680. Florida law, not only civil, but criminal statutes impose sanctions for invasion of privacy if such

invasion occurs through the use of mechanical devices for wiretapping and eavesdropping. Thus, Plaintiff's cause of action for invasion of privacy is recognized in Florida meeting the requirement of the FTCA as predicate for liability which is the existence of a valid cause of action under the law of the forum state.

100. Nontrespassory electronic surveillance is within ambits of 28 U.S.C. §2671, et seq., and §1346(b) of same title. But Defendants' surveillance activities have not been limited to the wiretapping of Plaintiff's telephones lines or the interception of Plaintiff's oral communications by an informant carrying a body bug. Defendants conspired to unlawfully make Plaintiff's residence the target of electronic surveillance, and furthered beyond all bounds of common decency the invasion of Plaintiff's privacy by surreptitiously entering Plaintiff's premises to install concealed video cameras inside Plaintiff's bedroom and bathroom.

101. Defendants have used the information obtained as result of the trespassory surveillance to make Plaintiff's premises the target of break-ins and burglaries, and to infiltrate and disrupt Plaintiff's private legitimate activities. Plaintiff is entitled to award of damages under FTCA for Defendants' disruption activities, surreptitious entries and use of informants. Florida Law defines the right of privacy as "essentially the right to be let alone to live one's life free from unwarranted publicity, and to live in a community without being held up to public gaze if one does not want to

be." The right is distinct in and of itself and not merely incidental to some other right. Defendants' have wrongful intruded upon the seclusion of Plaintiff and her private relations and activities, in such a manner and for such a long period of time as to outrage, or cause mental suffering shame or humiliation to a person of ordinary sensibility, and the unreasonable publicity given to Plaintiff's private affairs that are of no legitimate concern of the public, not only deprived Plaintiff of the right recognized under Florida law as the right of privacy, but also infringed Plaintiff's right to be secure in her person, house, papers and effects against unreasonable searches and seizures guaranteed under U.S. Constitutional Amendment 4. Even if Defendants had the statutory authority to intercept wire and oral communications, this would not deprive Plaintiff of a cause of action for the violation of her constitutional rights.

102. Plaintiff moreover alleges that Respondents have invaded her right of privacy by illegally intercepting her correspondence, including her certified letters, excluding it from the mails and wrongfully disseminating its contents (AFF3-44,51, AFF4-45, AFF6-321-323). Florida Law recognizes a claim for relief against a private person for intrusion upon the privacy of another, and such a claim includes the opening and reading of sealed mail. Accordingly, this action brought by Plaintiff to recover damages for injuries sustained as result of surveillance program involving opening and reading of mail is not barred by subsec. (b) of §2680, prohibiting suits arising

out of the 'loss, miscarriage, or negligent transmission of letters or postal matter'." Registered mail in essence is an exception to 28 U.S.C. §2671, et seq. and 1346(b) of the same title and allows liability to attach for loss or damage to certify mail. Defendants acts constitute an intrusion upon Plaintiff's person held to be a violation of the Federal Bill of Rights extending the early recognition that opening mail without a warrant (or with a warrant issued without probable cause, or by a non-detached judge or magistrate) is a violation of the Fourth Amendment.

103.   Defendants' surveillance activities have been undertaken in a vicious and malicious manner, not reasonably limited to any legitimate purpose, with the deliberate and calculated intent to inflict on Plaintiff great mental and physical pain and suffering, humiliation, embarrassment, shame, anguish and severe emotional distress. The conduct of Defendants has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and which is regarded as atrocious and utterly intolerable in a civilized society.

104. As direct result of the Defendants' wrongful actions and omissions, Plaintiff has suffered severe emotional and mental distress. Florida law of torts recognizes intentionally infliction of emotional distress as an actionable tort allowing recovery for mental pain and anguish inflicted in the course of deliberate or reckless conduct justifying the imputation of malice as a matter of law. There is no statutory exception

within FTCA for claim for intentional infliction of emotional distress.

105. Defendants have deprived Plaintiff of her right of individual autonomy, constitutionally protected, interfering with her right of marriage and with her familial relations. The right of privacy includes the right to prevent governmental interference with private decisions and relations. Respondents have intentionally infringed Plaintiff's right to be free from government searches and surveillance, and have breached their duty to avoid unwarranted disclosure of Plaintiff's personal information which is potentially embarrassing or harmful with the intent to shame and outrage Plaintiff, tortiously interfering with her emotional tranquillity.

106. The right of privacy is a right indispensable to some other constitutional rights. Through the unreasonable invasion of Plaintiff's privacy, Defendants have moreover interfered with Plaintiff's right to pursue her profession, and the right to enjoy and alienate property protected under U.S. Constitutional Amendment 5. Through the wrongful invasion of Plaintiff's privacy, Defendants have infringed Plaintiff's rights to associate, to communicate and to petition the courts for redress of her grievances against the government, all rights secured under U.S. Constitutional Amendment 1. The damages sustained by Plaintiff are not confined to the personal injuries that resulted from the severe emotional distress caused by the Defendants' wrongful actions and omissions. As result of Defendants' actions and omissions, the financial harm and the

personal injuries sustained by Plaintiff are immeasurable and irreparable.

107. Plaintiff alleges damages for civil conspiracy and trespass for Defendants' wrongful acts in pursuance of the conspiracy to commit the tort of interference with Plaintiff's right to practice her profession and to cause her dismissal from her employment as part of the Defendants' covert program to inflict on her physical, emotional and mental pain, and to make her suffer misery, ignominy, humiliations, embarrassment and distress. Claims for civil conspiracy and trespass of personalty are recognized under Florida Law and are not excluded from the FTCA. Florida Law defines the tort of conspiracy as "an agreement between two or more persons to achieve an illegal objective or an objective by illegal means, one or more overt acts pursuant to that agreement, and resulting injury to the plaintiff." The act done in pursuance of the conspiracy by one or several conspirators is an act for which each is jointly and severally liable. A conspirator does not need to take part in the planning, inception, or successful conclusion of a conspiracy to be held jointly and severally liable for all acts of coconspirators. Proof of conspiracy may be testimony which prima facie tends to prove the existence of the conspiracy or from which existence may be reasonably inferred, or proof may be circumstantial evidence where one can infer an individual's participation in a conspiracy. A conspiracy to interfere with an individual's employment, profession or business is actionable under Florida law of torts.

-111-

108. Under Florida law of torts trespass comprehends any misfeasance, transgression or offense which damages another's person, health, reputation, or property. Trespass to personalty is the intentional use of, or interference with, a chattle which is in the possession of another, without justification. Any unlawful interference, however slight, with another's enjoyment of his personal property is a trespass. "The FTCA authorizes recovery for damages for trespasses of the United States."

WHEREFORE Plaintiff, in this action against Defendant United States pursuant to Title 28 U.S.C. §§2671 et seq., 1346(b), demands damages in the amount of $20 million as demanded in her Amendend Administrative Claim presented to nine agencies named in her claim.

COUNT   II

CLAIM UNDER 28 U.S.C. §1350 AGAINST

DEFENDANTS CUBA, CUBAN POPULAR TRIBUNAL AND CASTRO

1. Arturo Ron-Fornes was acting under John Does I's control and direction when he engaged in an extramarital relationship with Gloria Ron-Fornes and embarked in a course of actions to punish Plaintiff's mother, Ana Messer.   Acting under the direction of John Does I, Arturo Ron-Fornes denied to Ana Messer the financial resources to cover the most elemental needs of the family home, interfered with Ana Messer's efforts to obtain a job, and, by threats and intimidation, intended to deter Ana Messer from seeking remunerated employment. Corruptly influenced by John Does I, Arturo and Gloria Ron-Fornes were acting in furtherance of the vendetta against the women of the family that Alfred Messer created with his Cuban wife, subjecting Ana Messer to cruel and unusual punishment and intentionally inflicting on her severe emotional and mental pain and suffering (Count I, ¶4).

2. In pursuance of John Does I's scheme designed in or about 1953, when the United States repatriated Eva Ron-Fornes' to Cuba, Arturo Ron-Fornes furthered his actions aimed at obtaining the custody of the children beyond all boundaries of common decency, threatening Ana Messer's brother, Julio, that he had the money to bribe twenty psychiatrists to get an adjudication of insanity, and Ana Messer confined to a mental institution for life. Arturo Ron-Fornes intended to take the children to reside with his sister Eva, but the court granted the custody to Ana Messer. When the Cuban courts under Batista's

-113-

government frustrated the scheme, John Does I conspired to overthrow Batista, to place Defendant Castro in power in Cuba, and to execute the scheme acting through Defendant Castro.

3. After conspiring with Defendant Castro to get Arturo Ron-Fornes released from jail, John Does I continued to instigate Arturo and Gloria Ron-Fornes's acts to injure Ana Messer and the children. Acting under the direction and control of John Does I, Arturo and Gloria Ron-Fornes interfered with Ana Messer's plans to leave Cuba after 1960, instigated Ron's misconduct and abuses of her mother, and designed a scheme to place Ana Messer under the control of a legal guardian. That was the condition imposed by John Does I to Arturo and Gloria Ron-Fornes before issuing their visas, and granting them authorization to enter the United States.

4. Every attempt made by Ana Messer to leave Cuba was interfered by Ron, acting under the instigation of Arturo Ron-Fornes, who, in 1960, in furtherance of John Does I's conspiracy to prevent Ana Messer and the children from leaving the island, refused to authorize Ron to travel to the United States with a visa waiver. In 1962, after the defeated Bay of Pigs invasion of Cuba, Ana Messer intended to travel with the children in the red-cross ships that delivered to Cuba the food and medications donated in exchange for the prisoners of the invasion. Ana Messer's nephew, Nilo Messer, participated in said invasion. Instigated by Arturo Ron-Fornes, Ron threatened Ana Messer that he would scream at the Port of Havana that he did not want to leave because he was revolutionary and Communist. In or

-114-

about 1964, Ana Messer offered Ron two more opportunities to leave Cuba, getting political asylum in an embassy, and getting enrolled as member of a ship crew. Influenced by Arturo and Eva Ron-Fornes, Defendant Ron rejected both offers.

5. Defendants John Does I continued to conspire with Defendant Castro to injure Ana Messer and the children demanding from court officers under Castro's control and direction to place Ana Messer under legal guardianship, to appoint Eva as Ana Messer's legal guardian, and, in return for issuing the visas to enter the United States for Arturo and Gloria Ron-Fornes and subsequently the citizenship of the United States, concealing Arturo's criminal record, Gloria's sexual past and the reasons of Arturo's and Ana's divorce, to obtain Eva's tacit promise to act in furtherance of the scheme to injure Ana Messer and the children after leaving Arturo and Gloria Ron-Fornes the island.

6. There was no legal or moral justification for the concerted actions of Defendants John Does I, Castro, Arturo and Gloria Ron-Fornes to place Ana Messer under legal guardianship. Ana Messer did nothing to deserve, legally or morally, to be subjected to the control and surveillance of a legal guardian, but Defendant Castro, as Prime Minister or President of Cuba, acting directly or through his subordinate officials, under color of official authority, placed Ana Messer under legal guardianship in violation of Ana Messer's basic human rights and fundamental freedoms guaranteed to all persons by the United Nations Charter in furtherance of John Does I's scheme to subject

-115-

Ana Messer to cruel and unusual punishment for being the daughter
of Alfred Messer with his Cuban wife.

7. Defendant Castro willfully acted in furtherance of John
Does I's conspiracy with knowledge that John Does I, Arturo
and Gloria Ron Fornes embarked in a concerted effort to place Ana
Messer under legal guardianship for the purpose of preventing Ana
Messer and the children from leaving Cuba, or for the purpose of
subjecting Ana Messer and the children to humiliating, cruel and
degrading treatment in territory of the United States, where John
Does I, using the fraudulent guardianship approved by Castro's
government, would subject Ana Messer and the children to the
arbitrary interference with their liberty and personal security,
with their privacy, their familial relations, their marriage in
violation of Articles 3, 9 and 12 of the Universal Declaration of
Human Rights.

8. Meanwhile, Defendant John Does I conspired to consolidate
Castro's government in Cuba, through the political asylum given
by the United States to the enormous number of Cubans that began
to leave the island in 1959, through the defeat of the invasion
of Cuba in April 1961, through the Kennedy-Krushchev pact reached
by the United States and the Union of Socialists Soviet Republics
("USSR") after the Missile Crisis of October 1962, under which
United States President John F. Kennedy pledged to the Soviet
Union Premier Nikita Krushchev that the United States would not
invade Cuba, and the huge contributions funneled to the Cuban
government through the USSR, whose support was sought by Castro

because that was the only manner to explain to the Cubans exiled in the United States the perpetuation of Castro in power.

9. From the foregoing facts it must be inferred that Defendants Cuba and Castro, corruptly influenced by John Does I by bribery and extortion, embarked in a joint venture with John Does I to discriminate against Ana Messer preventing her from leaving Cuba with her children. But the major purpose of the tortious acts perpetrated by Defendant Castro under color of official authority, in violation of international law, was to build the foundation of a structure carefully designed to deprive Ana Messer and the Plaintiff in territory of the United States of their basic rights and fundamental freedoms guaranteed to all persons by the United Nations Charter and by the Universal Declaration of Human Rights, and to deprive Ana Messer and the Plaintiff, in territory of the United States, of the rights secured to all American citizens under the laws and the Constitution of the United States in furtherance of John Does I's vendetta against Alfred Messer's Cuban female descendants.

10. Defendants Cuba and Castro, acting as agents and at the instigation of John Does I, committed multiple tortious acts in violation of the law of nations that were designed to result in the injuries sustained in territory of Cuba by Ana Messer, by the children and by other members of the family that Alfred Messer created with his Cuban wife, and were designed to result in the personal injuries and property losses sustained in territory of the United States by Ana Messer and the Plaintiff.

11. In pursuance of Defendants John Does I's compromise to

-117-

conceal Arturo and Gloria Ron-Fornes's past and to fabricate a new life for them in territory of the United States, Defendant Johns Does I conspired with Defendants Cuba and Castro, upon the initiation of the Camarioca exodus that took place in or about October 1965, to enact a law preventing Ana Messer and the children from leaving the island. The law passed by Cuban officials under Defendant Castro's direction and control prohibited males between the ages of 15 and 27 to leave Cuba, and guaranteed to John Does I, Arturo and Gloria Ron-Fornes that Defendant Ron, who was then 20, and consequently, Ana Messer and the daughters, would not be able to leave Cuba before June 1972.

12. Meanwhile, Defendants John Does I conspired with Arturo and Gloria Ron-Fornes to direct the wife of Julito Messer, Ana Messer's nephew, to file with the Cuban Department of Immigration an application to leave Cuba through the Flights of Freedom that were established after the Camarioca exodus. The reclamation was done by a friend, because Julito's wife, Dinorah, had no close relative in the United States, but it was accepted by the Cuban Department of Immigration and by the Department of Interests of the United States in Havana, in furtherance of John Does I's compromise to conceal Arturo's criminal record, Gloria's sexual past and the reasons that caused the divorce of Plaintiff's parents. By bringing Dinorah and Fernando, Julito's son, to reside in New Jersey, where Arturo and Gloria resided, John Does I intended to compel Julito to come to reside to New Jersey too, and, with his friendship, tacitly support the

-118-

foundation of lies fabricated by John Does I that served as basis for Arturo and Gloria Ron-Fornes' new life in the United States.

13. Ana Messer's brother, Julio Messer, had two more children: Miriam and Cesar. Miriam and Cesar died in 1967 and 1969, respectively. Miriam was 21 when she died when a truck of the Cuban Army that failed to respect a red light and was driven by a recruit under the influence of alcohol and acting under the direction and control of Defendant Castro, intentionally collided Julio's car. Cesar was 19, and was passing the military service with the Cuban Army, when he died after being intentionally injured while he swam in a water press with other recruits that acted under the direction and control of Defendant Castro. Military officials under Castro's direction and control perpetrated tortious act designed to result in the murder of Miriam and Cesar Messer in furtherance of John Does I's vendetta against the family of Alfred Messer with his Cuban wife. Defendants Cuba and Castro failed or refused for improper motives to investigate the deaths of Miriam and Cesar Messer that Defendant Castro knew were not accidental and were instigated by John Does I.

14. In or about August 1996, a Cuban female named Lima, acting under the direction of Defendants John Does I, introduced herself to the Plaintiff as Miriam's co-student, and told Plaintiff that Miriam and Cesar's deaths in Cuba were the result of Defendant Castro' vendetta, because Julio, as Lieutenant of the Cuban Navy, caused the defeat of one of Castro's commando operations before January 1, 1959. The argument was devoid of

factual basis, raised without a prior rational analysis of the evidence and for the sole purpose of concealing the actual mobile in Plaintiff's cousins deaths. Had Julio caused the defeat of one of Castro's commando operations, he would have been executed when he was confined to La Cabana right after the triumph of Castro's forces on January 1, 1959 (AFF7-21,30).

15. In or about 1967, Julito got engaged with a girl that attended the same school that Miriam attended. On several ocassions, Julito stated that he intended to get the divorce from Dinorah that was in waiting list to travel to the United States, and to marry that girl. The deaths of Plaintiff's cousins in Cuba was the result of the conspiratorial activities of Defendants John Does I with Defendants Cuba and Castro, in furtherance of John Does I, Arturo and Gloria Ron-Fornes' carefully designed scheme to compel Julito to go to reside in New Jersey, because, being divorced from Julito, Dinorah's friendship did not serve Defendants John Does I's purpose of fabricating a new image in the United States for Arturo and Gloria Ron-Fornes concealing Arturo's criminal record and Gloria's past (AFF7-35). Defendants Cuba and Castro, acting as agents of John Does I, in furtherance of a joint venture with John Does I, caused the deaths, or wilfully authorized John Does I to use the Cuban territory and officials under Cuba and Castro's control to cause the deaths of Plaintiff's cousins, Miriam and Cesar Messer. As result of the tortious     committed by Defendants Cuba and Castro, under color of official authority in violation of the law of nations for the purpose of punishing the family that Alfred

-120-

Messer created with his Cuban wife, Plaintiff's cousins, Miriam and Cesar Messer, were deprived of life in violation of Articles 55 and 56 of the United Nations Charter that promotes the Universal respect for, and observance of human rights and fundamental freedoms, and in violation of Article 3 of the Universal Declaration of Human Rights that mandates the protection of life of person.

16. Defendant Ron was enlisted in the Cuban military service in April 1965. While Ron was in the army, his mother provided him with everything that he needed: cash, food, medications, clothes, etc. When he did not like the food served in the unit, he bought food from a country-man in a farm of the vicinity with cash provided by his mother. Ron was allergic to the olive underwear and his mother bought white underwear for him, that Ron burned, instead of washing, after wearing it, abusively forcing his mother to get new underwear for him every week.

17. When Arturo Ron-Fornes left Cuba in 1964, Defendant Ron, as direct result of his father's influence had become a coward abusing his mother. After passing the military service, Ron's misconduct towards his mother escalated. Defendant Ron began to work assisting a TV repairman, Herminio Castro, who paid Ron about $100 for one day of work assisting him, but Ron refused to contribute to the expenses of the home refusing to pay the monthly fee of $60 that his mother assigned him and included rent, utilities, food, cook, maid laundry services, and even tailor service because his mother did all the sewing that he needed, including new shirts, alterations to pants, etc.

18. On one occasion, after spending with the family the day in Batabano, a small town in South Havana where Defendant Ron had an argument with a girlfriend, Defendant Ron caused a great disorder in the home, turning up and breaking furniture and doors, spreading bags of rice, beans, sugar, all over the house, throwing against the walls the chicken that his mother was cooking, the meat, lobster that was in the freezer, and shaking, pushing and injuring his mother when she tried to stop him. Maria and Eloy Norman, fearing that Ron could seriously injure himself or his mother, called Ana Messer to let her know that they would request police assistance. When Defendant Ron saw the officers, he shouted at his mother: "This is all I needed from you." (Esto era lo unico que te faltaba por hacerme). The police officers witnessed the conditions in which Ron left the house, and intended to take Ron for psychiatric treatment. The officers left without arresting Ron, because Ron promised to attend a psychiatrist, but when the officers left, Ron refused to see any doctor or receive any therapy.

19. After getting married with Defendant Nancy in or about November 1970, the situation turned worse, because, in addition to the arguments that Defendant Ron caused with the intent to intimidate his mother, Defendant Ron was the entire day screaming, yelling and shouting insults at Nancy. In or about May 1971, one evening Defendant Ron asked Nancy to serve his dinner while he went out to check an antena that he was installing on top of the roof. When Defendant Ron returned and saw that his dinner was not served yet, he began to scream and

yell at Nancy and ordered her to pack his stuff and go. Defendant Ron left Nancy with her belongings at the entrance of the building where Nancy's brother-in-law, Martin, resided (See Count I, ¶10). Two days later, Defendant Nancy appeared at home to inform Ana Messer that she intended to file for divorce, and to register again at the school that she attended before getting married where she coursed seventh grade. On the next occasion that Defendant Nancy appeared at home, she was crying after being communicated by Martin that she had to return to reside in Nicaro, Oriente. A few days later, Nancy moved back to Oriente.

20. In or about January 1972, Defendant Nancy appeared in the home where Defendant Ron resided with his mother, Ana Messer, and sisters, including the Plaintiff. Acting under Defendant Ron's direction, Defendant Nancy refused to speak to Ron's mother and sisters intentionally creating an environment of hostility. Meanwhile, Eva took advantage of the situation and tried to persuade the Plaintiff, acting through her sister, to move to their grandmother's home, but Plaintiff refused. Acting under the instigation of Eva, in pursuance of the scheme carefully designed by John Does I to influence Eva, by intimidation and extortion, to act in furtherance of the vendetta against Ana Messer and her children as condition to allow Arturo and Gloria Ron-Fornes to maintain their status in the United States, Defendants Ron and Nancy furthered their actions aimed at disturbing the peace of the home, and intimidating the rest of the family.

21. Defendant Nancy was pregnant and delivered the baby on

May 24, 1972. Less than a month later, Defendant Ron intended
to burn down the house with the entire family inside, including
his baby. Plaintiff exited her bedroom to learn the reason of
Defendant Ron's screams, and saw that Defendant Ron was lying on
the floor where he had spread some combustible.  Plaintiff's
mother and sister and Defendant Nancy were also on the floor
trying to get the matches that Ron intended to light. Despite
the force applied by the three women, they could not reduce Ron
under control and the Plaintiff called the police. Defendant
Ron was transported by the police officers to the Department of
Legal Medicine where Ron was submitted to a psychiatric
evaluation. A panel of psychiatrists diagnosed that Defendant
Ron suffered schizophrenia with severe aggressiveness. Defendant
Ron was referred to the Psychiatric Hospital of Havana.
Defendant Nancy and Nancy's relatives obtained Ron's release from
the hospital. Defendants Ron and Nancy moved to Oriente where
Nancy stayed for more than two years, but Ron returned a month
later and was most of the time in Havana.

22.  Before and after leaving Cuba, Arturo and Gloria
Ron-Fornes, acting under the control and direction of John Does
I, instigated Defendant Ron, directly and through Eva, to
interfere with his sisters' private affairs (AFF7-4,10-21,36-40).
In April 1968, Defendant Ron opposed Plaintiff's relationship
with Jorge Orsais, whose sister, Mariela Orsais, was dating with
Ron. Defendant Ron broke up with Mariela and prohibited the
Plaintiff from receiving Orsais' visits at home. In August
1969, Defendant Ron opposed Plaintiff's relationship with Antonio

Radillo, alleging that Radillo could not leave Cuba because
Radillo had passed a training in missiles with the Cuban Army,
refusing to allow Radillo to continue to visit the Plaintiff at
home. A year after opposing Plaintiff's relations with Radillo
by reason of Radillo's alleged inability to leave Cuba, Defendant
Ron precipitated a marriage with Nancy, a woman integrated to the
government as well as most of her family, to interfere with
Plaintiff's plan to leave Cuba via Havana-Madrid. Defendant
Ron's attempt to burn down the house in June 1972, was Ron's
reaction upon learning that Ana Messer had authorized Plaintiff
to receive Radillo's visits at home again (AFF7-10).

23.  In pursuance of the conspiracy to punish Ana Messer and
the children, Defendant John Does I corruptly influenced Arturo
Ron-Fornes, who was already engaged in an extramarital
relationship with Defendant Ron-Fornes, to prevent Ana Messer and
the children from receiving any portion of the estate of
Plaintiff's grandfather, Arturo Ron Gomez, who died in 1957.
Plaintiff's uncle, Alberto Ron-Fornes, left Cuba in 1962. Arturo
Ron-Fornes left Cuba two years later.  Before leaving Cuba,
both, Alberto and Arturo, sent to the United States through an
embassy briefcases full of valuable collections of stamps that
were part of Plaintiff's grandfather's state.  Plaintiff's
grandmother and aunts, Eva and Maria, received the proceeds from
the sale of a large amount of stamps and had additionally two
file cabinets full of stamp collections that were left under
Eva's control when Arturo Ron-Fornes left Cuba in 1964. The
only portion of the proceeds from the sale of stamps belonging to

that estate received by Ana Messer and the children was the money used by Plaintiff's sister to buy her ticket to travel via Havana-Madrid, that was insufficient to pay for both air fares.

24. When Plaintiff decided to call Arturo Ron-Fornes, who was then residing in New Jersey, to ask him the money of her air-fare, Eva, acting under the direction of John Does I, intended to dissuade the Plaintiff. Knowing that Arturo Ron-Fornes was under Defendants John Does I's control, and believing that Defendants John Does I would not authorize Arturo Ron-Fornes to remit the money to Plaintiff, Eva told her: "Your father will send you nothing." Defendants John Does I designed a more devilish scheme authorizing Arturo Ron-Fornes to remit the money to Plaintiff to fraudulently conceal their involvement in the conspiracy to prevent Plaintiff from leaving Cuba, thereupon engaging in an effort to recover the money received by the Plaintiff and her sister making them to pay for it, and to corruptly influence Defendant Castro to cause the interruption of the flights Havana-Madrid to prevent them from leaving Cuba (See Count I, ¶9).

25. In pursuance of Defendants John Does I's conspiracy, Eva persuaded Plaintiff's sister to send her jewelry to the United States through an embassy. Eva did it with knowledge that Defendants John Does I was conspiring with Defendant Castro to prevent Plaintiff and her sister from leaving Cuba, and that Plaintiff's sister would never see her jewelry again, but Eva knew that her actions in furtherance of John Does I's conspiracy to injure Ana Messer and the children was a condition imposed by

-126-

John Does I to allow Arturo and Gloria Ron-Fornes to maintain the status fabricated for them by John Does I in the United States. Eva moreover took Plaintiff's savings that Plaintiff was securing in her grandmother's home. Eva refused to return the money, about $900, to the Plaintiff despite Plaintiff's mother and grandmother's requests urging Eva to refund it.    Finally, Plaintiff grandmother refunded the money wrongfully taken by Eva.

26.  Meanwhile, Defendants John Does I conspired with Defendants Cuba and Castro to compel Eva's marriage with Miguel, and Ron's marriage with Nancy with the intent to influence Miguel, member of the MININ, Nancy and Nancy's relatives, most of them integrated to the Cuban government, including Martin, also member of the MININ, to act in furtherance of the scheme designed by Defendants John Does I and Castro to dissuade, prevent or deter the Plaintiff and her sister from leaving Cuba, or to subject the Plaintiff, her mother and sister to cruel and unusual punishment in territory of the United States.

27. In pursuance of John Does I's conspiracy for the purpose of preventing, dissuading or deterring the Plaintiff and her sister from leaving Cuba, Defendant Castro, acting as an agent of John Does I, published in a Cuban magazine in or about September 1970, a notice of the closing of the flights Havana-Madrid and informing the persons in waiting list to leave Cuba through said via that all the applications received after May 31, 1970, were invalid or null.   Officials of the Cuban Department of Immigration, acting under Defendant Castro's direction and control, informed the Plaintiff on several occasions that

-127-

Plaintiff went to inquire about the status of her application that Plaintiff, who sent her application in June 1970, had no opportunity to travel to Spain.

28. Meanwhile, Defendants John Does I conspired with Eva, Arturo and Gloria Ron-Fornes to instigate Defendant Ron's desire of vengeance against the Plaintiff for her having called the police when Ron intended to burn down the house, or to justify Defendant Ron's actions aimed at injuring the Plaintiff that they instigated much before the incident in which Plaintiff's called the police. Acting under the instigation of Eva, Arturo and Gloria Ron-Fornes, Defendant Ron tried to make Plaintiff's life unbearable with the intent to compel Plaintiff to move out of the home, and to punish her for her having refused to move out when her sister, directed by Eva, tried to persuade her to do it in or about January 1972, in furtherance of John Does I's conspiracy to ruin the family that Alfred Messer created with his Cuban wife, and to leave Ana Messer under the sole control of Defendants Ron and Nancy with the intent to punish Ana Messer, acting through Defendants Ron and Nancy, like they subsequently did in territory of the United States.

29. Defendants John Does I continued to conspire with Defendant Castro to prevent the Plaintiff from traveling to Spain. Acting through Eva, Arturo and Gloria Ron-Fornes, Defendants John Does I and Castro instigated Defendant Ron to tell the Cuban authorities that Plaintiff could not obtain a career paid by the Revolution to exert it in the United States, and to demand from Cuban organizations to compel the Plaintiff to

renounce to her application to travel to Spain as condition to obtain a registration for the school and a job in Cuba after three years in the waiting list to leave Cuba for Spain.

30. Meanwhile, Defendants John Does I and Castro designed the most devilish scheme to persuade the Plaintiff to stay in Cuba, or to subject the Plaintiff in territory of the United States to a cruel, degrading and inhuman treatment, intentionally inflicting on her severe pain and suffering, depriving her, by reason of her sex and ethnicity, of basic human rights and fundamental freedoms guaranteed to all persons by Articles 55 and 56 of the United Nations Charter, denying her equal rights and self-determination, denying her conditions of economic and social progress and development, denying her full employment, denying her the equal right to buy, own, enjoy and sell property, condemning her to misery and ignominy, subjecting her to the arbitrary interference with liberty, personal security, privacy, marriage, correspondence, all rights protected by Articles 3, 9 and 10 of the Universal Declaration of Human Rights, and depriving Plaintiff of the rights secured to all American citizens by the laws and the Constitution of the United States.

31. In pursuance of a scheme carefully designed by Defendants John Does I and Castro to persuade Plaintiff to stay in Cuba, Cuban officials of the Ministry of Education under Castro's direction and control allowed Plaintiff to register at a school in spite of Plaintiff's refusal to sign any paper canceling her application to leave Cuba for Spain. Meanwhile, Defendants John Does I and Castro conspired with officials of the

Cuban Popular Tribunal under Defendant Castro's control and direction, with Eva, Arturo and Gloria Ron-Fornes, Ron, Nancy, Martin and Ileana for the purpose of building the structure designed to deprive Plaintiff in territory of the United States of the human rights and fundamental freedoms found in international law, and of the rights secured under the laws and the Constitution of the United States.

32. In pursuance of Defendants John Does I and Castro's scheme to fabricate the structure that would be used by Defendants John Does I to subject Plaintiff to cruel, inhuman and degrading treatment in the United States, in or about July 1974, Defendant Ron, at the instigation of Defendant Castro, filled in the Sectional Office where Nancy's sister Ileana used to do voluntary work, a fraudulent transfer out request with the intent to delete Plaintiff's name from the household documents and to exclude her from the house. Defendants John Does I and Castro furthered their tortious acts instigating Defendant Ron to accuse Plaintiff of being hiding the allowance cards when Plaintiff took them to clarify the matter of the fraudulent transfer filled by Ron, causing that Plaintiff was summoned to appear at the Popular Tribunal of the neighborhood a few days later.

33. Acting under the instigation of Defendants John Does I, Arturo and Gloria Ron-Fornes, Defendant Ron appeared at the hearing in the Popular Tribunal with an attorney hired by Eva to move for the submission of the Plaintiff to a psychiatric evaluation. Without legal justification, the officer operating as arbitrator of the Popular Tribunal, acting under the control

and direction of Defendant Castro, granted the motion. Plaintiff appeared at the Psychiatric Hospital of Havana carrying the evidence of her performance at the school, and spoke with several psychiatrists. One of the psychiatrists specifically told Plaintiff: "Ask your fiance to get you an attorney, because you are competent." Plaintiff's fiance, Jorge Fernandez, was waiting outside. Plaintiff was told to return at any time before the closing of the Admission Office at the end of the day. Plaintiff was subjected to arbitrary detention overnight. The next day, right after the psychiatric evaluation, she was released. Plaintiff received no therapy or medication, and was applied no treatment, neither during the hours that she was in the hospital, nor after her release. At the next hearing, the Attorney hired by Plaintiff's fiance, Attorney Jorge Bacallao, obtained an order dismissing the claim (AFF7-16). No notice was ever given to Plaintiff that any further action would be taken in relation with that case. Any action taken without notice to Plaintiff or any order entered different to the order of dismissal, was entered by fraud and is null and void.

34.    Plaintiff believed that the action was solely the result of Defendant Ron's vendetta, undertaken by Ron with the intent to interfere with Plaintiff studies, her opportunities for employment in Cuba, and her relationship with Jorge Fernandez, that Defendant Ron opposed not allowing Plaintiff's fiance to visit the home. The tortious acts perpetrated by Defendant Castro, and officials of the Popular Tribunal under Castro's control and direction, were carefully designed to result in the

deprivation of Plaintiff's rights in territory of the United States where Defendants Castro, John Does I, Ron, Nancy, Arturo and Gloria Ron-Fornes would use the submission of Plaintiff to a psychiatric evaluation in Cuba to fraudulently subject Plaintiff to legal guardianship without notice and without submitting her to a psychiatric evaluation in the United States in pursuance of a scheme to subject Plaintiff to cruel and degrading treatment in this country, to deprive Plaintiff of the right to pursue a profession, to deprive Plaintiff of her property rights, to despoil her of her possessions and to condemn her to misery, ignominy, humiliations and indignities for the purpose of punishing her for leaving Cuba for the United States, and in furtherance of John Does I's conspiracy to subject the women of the family that Alfred Messer created with a Cuban wife to cruel and unusual punishment.

35. Defendants Castro, John Does I, Arturo and Gloria Ron-Fornes, Eva and Ron knew that Plaintiff suffered no mental illness, and there was no legal or moral justification for the submission of the Plaintiff to a psychiatric evaluation. Plaintiff was obtaining the best qualifications at school. After the evaluation, Defendant Castro and Cuban authorities of the Ministry of Education under Castro's authorization and control, approved Plaintiff's employment as Instructor of Mathematics where Plaintiff's performance was rated outstanding, and Plaintiff's applications to register at the best school located in Linea and L, Vedado, Havana, and subsequently at the University of Havana where Plaintiff's obtained the best

qualifications.   Defendant Castro authorized Plaintiff to work in Education and to register at the University of Havana without compelling her to renounce to her request to leave Cuba, and without meeting the requirement of integration to government organizations in furtherance of Defendants John Does I's scheme to dissuade the Plaintiff from leaving Cuba.

36.   When Defendant John Does I conspired with Arturo Ron-Fornes to deprive Ana Messer of the custody of the children, Plaintiff, who was then 8 years old, always stated throughout the hearings of the divorce that she wanted to live with her mother. Although the Plaintiff visited her grandmother's home almost daily, she always preferred to live in her mother's home. Defendants John Does I, Eva and Arturo Ron-Fornes fraudulently concealed that Ana Messer was under legal guardianship with the premeditated intent to prevent the Plaintiff from taking any action to terminate such fraudulent guardianship. Plaintiff's refusal to leave her home in January 1972, was another reason to exacerbate Defendants John Does I, Arturo and Gloria Ron-Fornes, Eva and Ron's desire to punish the Plaintiff.   For the purpose of punishing the Plaintiff, Defendants John Does I, Arturo and Gloria Ron-Fornes, Eva, Ron, Nancy and Nancy's relatives conspired with Defendants Castro and the Popular Tribunal to submit Plaintiff to a psychiatric evaluation.   Meanwhile, in furtherance of the conspiracy to punish the Plaintiff, who remained in ignorance of the fact that her mother was under the control of a legal guardian, Defendants John Does I and Castro, conspired with Eva and Ron to subject Ana Messer to the

-133-

administration of mind altering substances calculated to disrupt profoundly her sense and personality with the intent to manipulate her behavior, and to fradulently conceal themselves and their involvement in the commission of the wrongs against the Plaintiff.

· 37. The Official from the Cuban Department of Immigration that appeared at Plaintiff's home the day the inventory of the property was taken, tried to dissuade the Plaintiff from the idea of leaving Cuba through the Repatriation Program (AFF7-23), promising her a future in Cuba, because said official, acting under Defendant Castro's control and direction, knew that Plaintiff's family was the target of Defendants John Does I's vendetta. Defendant Castro knew that his tortious acts under color of official authority, submitting the Plaintiff to a psychiatric evaluation in Cuba would result in the deprivation of Plaintiff's rights in the United States, but Defendant Castro, not only fraudulently concealed that Plaintiff would be subjected to the deprivation of her rights in the United States up to her submission to the control of a legal guardian, but Defendant Castro continued to conspire with Defendants John Does I, Ron, Nancy and Clara and their relatives living in Cuba, Ileana and Martin, to punish the Plaintiff after her having left Cuba, contributing to deprive her in territory of the United States of basic human rights and fundamental freedoms found in international law, and of the rights secured under the laws and the Constitution of the United States.

38. When Plaintiff filled the applications to leave Cuba

through the Repatriation Program, Defendants John Does I conspired with Defendant Castro to compel Defendants Ron and Nancy to join in the application to leave Cuba through the Repatriation Program against their will, to continue to fraudulently conceal Ana Messer's legal status, preventing the Plaintiff from learning, upon her arrival at the United States, of Defendants John Does I and Castro's conspiracy to subject Ana Messer to the control of a legal guardian, and to an abusive and unreasonable surveillance for the purpose of preventing Ana Messer from revealing any information about Arturo Ron-Fornes' criminal record and Gloria Ron-Forness' sexual past that Defendants John Does I and Castro conspired to conceal. Defendant John Does I conspired with Defendant Castro to instigate Defendants Ron and Nancy to discharge their frustration, embarking in a course of actions to defame the Plaintiff with the intent to deprive Plaintiff in the United States of the right to live in conditions of economic and social progress and development, to full employment according to Plaintiff's academic qualifications, and to a higher standard of living.

39. Defendant Castro knew of Defendant Ron's ill feelings towards her mother that were intentionally instigated by Eva, Arturo and Gloria Ron-Fornes upon Arturo' release from jail by Defendant Castro, acting in furtherance of John Does I's conspiracy. Defendant Castro knew of Defendant Ron's ill feelings towards the Plaintiff that were intentionally instigated by Defendant Nancy and Nancy's relatives acting under Defendants

-135-

John Does I, Arturo and Gloria Ron-Fornes and Eva's direction, when Ron was diagnosed schizophrenic in June 1972, when Plaintiff refused to renounce to her request to leave Cuba via Havana-Madrid in September 1973, and when Plaintiff filled the applications to leave Cuba through the Repatriation Program in August 1978.    Defendant Castro condoned, joined and acted in furtherance of Defendants John Does I's conspiracy to vest Defendant Ron with power and authority to control, not only Ana Messer's life through afraudulent guardianship, but also Plaintiff's life, without notice to Plaintiff. Defendant Castro knew that Defendant Ron would misuse and abuse such power and authority, and Defendant Castro did it with the malicious and evil intent to, acting through Defendants Ron and Nancy, cause the severe personal injuries and property losses suffered by Plaintiff in the United States.

40. As early as their first day in the United States, Defendants Ron and Nancy began to act in furtherance of John Does I and Castro's conspiracy to defame the Plaintiff communicating to Nancy's sisters, Clara and Margot, slanderous statements falsely charging the Plaintiff with being Communist. Defendants Ron and Nancy knew, not only that the statement was false, but also that by charging Plaintiff with being Communist they could cause the greatest injuries to Plaintiff's reputation in a conservative community like the Cuban community of Miami. Defendants Ron and Nancy knew it, because Defendants Ron and Nancy were acting under the direction and control of Defendants John Does I and Castro in pursuance of a conspiracy to hinder

Plaintiff's economic advancement and to prevent Plaintiff from offering Ana Messer financial assistance while Defendants Ron and Nancy refused to work in the United States (See Count I, ¶19).

41. Knowing of Defendants Ron and Nancy's frustration as result of Plaintiff's success in obtaining a well remunerated employment with the Post Office and a scholarship to complete a career at a university of the United States, knowing that Plaintiff had offered Ana Messer financial assistance, and fearing that Ana Messer could move to reside with the Plaintiff, Defendants Castro, John Does I and John Does III conspired to corruptly influence the most powerful leaders of the Cuban community in Miami to act in furtherance of the conspiracy to hinder Plaintiff's professional and economic advancement and to obtain a job for Defendant Nancy (See Count XXIV).

42. Meanwhile, Defendants Castro conspired with Defendants Ron and Nancy and with Nancy's relatives in Cuba to cause the Mariel exodus and to send through said exodus some of Nancy's relatives, the same relatives that insulted Defendant Nancy the eve of the flight that brought Defendant Nancy to Miami on October 3, 1978, and blamed the Plaintiff because her decision to leave Cuba compelled Defendant Nancy to leave too. Defendant Nancy's relatives were sent by Defendant Castro to Miami with instructions to act in furtherance of the conspiracy to defame the Plaintiff, falsely portraying Defendants Ron and Nancy as the victims of a Communist sister.

43. The Flights of the Community approved by Defendant Carter in 1978, were designed to provide Defendant Castro with

-137-

huge proceeds that served to corruptly influence Defendant
Castro, by bribery, to act in furtherance of John Does I's
conspiracy to injure Ana Messer throughout the processing of Ana
Messer's application to leave Cuba, and after Ana Messer's
arrival at the United States. Between 1982 and 1990, while
Defendants John Does I, John Does II, John Does III, Marcus,
Reno, Dade Officials, the CANF, Church & Towers, Ron, Nancy,
Arturo and Gloria Ron-Fornes conspired to ruin Plaintiff's
career and employment record, to make the Plaintiff and her
premises the target of unlawful electronic surveillance, to
wrongfully interfere with Plaintiff's private affairs, to
appropriate Plaintiff's real property, to despoil Plaintiff of
her personal property and her money, to conceal Ana Messer's
illness and deny her the medical treatment that could have
prolonged her life, to prevent Plaintiff's sister from leaving
Cuba until the eve of Ana Messer's death after a week in comma,
and to deny Plaintiff the right to seek relief for her injuries
in a court of law, Defendant Clara visited Cuba through the
Flights of the Community on numerous occasions, because Defendant
Clara was Defendant Castro's unofficial liaison to the Officials
of the States of Florida and New York embarked in a joint venture
to deprive Plaintiff of basic rights and fundamental freedoms
guaranteed to all persons by international law, and to deprive
Plaintiff of the rights, privileges and immunities secured to all
American citizens under the laws and the Constitution of the
United States.

44. While Defendants John Does I, John Does II, John Does

III, Marcus, Reno, Dade Officials, the CANF, Ron, Nancy, Arturo and Gloria Ron-Fornes conspired to deprive Plaintiff of the rights of association and privacy secured under U.S. Constitutional Amendments 1 and 4, Defendant Clara corruptly influenced Defendant Castro to act in furtherance of the designed in Miami to terminate Plaintiff's engagement with Farah and to compel the Plaintiff to engage in a relationship with Tony Radillo that the Defendants would subsequently terminate, too (See ¶22) (See Count XXVII). In furtherance of the scheme, Defendant Castro approved a vacation trip to East Europe for Radillo with knowledge that, in furtherance of the scheme, Radillo would not return to Cuba. Radillo requested political asylum in Gander, Canada, and wrote to Plaintiff indicating that said letter was the third letter that Radillo sent to Plaintiff. Radillo's previous letters were intercepted by the Defendants in furtherance of the practice of invasion of Plaintiff's right of privacy and search for evidence that could be used to defame the Plaintiff.

45. Right after taking over in Cuba on January 1, 1959, Defendant Castro began to act in pursuance of Defendants John Does I's vendetta against the family that Alfred Messer created with his Cuban wife. Defendant Castro, as Prime Minister or President of Cuba, under color of official authority, perpetrated, and instigated other Cuban officials under his authority and control to perpetrate multiple tortious acts in violation of the law of nations designed to result in the death of Miriam and Cesar Messer, the personal injuries and

emotional and mental pain and suffering inflicted on Ana Messer, the deprivation of Plaintiff's basic human rights and fundamental freedoms, the cruel and degrading treatment received, and the substantial property losses and immeasurable and irreparable personal injuries suffered by Plaintiff in the United States.

46. The tortious acts committed by Defendants Castro and by the arbitrator of the Cuban Popular Tribunal, a governmental unit beneath the central government, were premeditated and calculated to result in the deprivation in the United States of Plaintiff's rights to obtain employment, to enjoy a higher standard of living and conditions of economic and social progress and development, to buy, own, enjoy and sell real property, the rights of privacy, marriage, to receive and send correspondence without arbitrary interference, the right not to be subjected to arbitrary arrest or detention.

47. As result of Defendants Popular Tribunal and Castro's tortious acts in pursuance of a joint venture with Defendants John Does I to inflict cruel and unusual punishment to Alfred Messer's Cuban female descendants, Ana Messer was arbitrarily labeled a foreign power by Defendant Carter Administration and was made the target of an abusive electronic surveillance pursuant to 50 U.S.C. §§1801, et seq., the real property bought by Plaintiff as her residence was labeled the premises of a foreign power, was made the target of electronic surveillance, and was subjected to the control of a guardian appointed for Ana Messer's property without notice to the Plaintiff that Ana Messer was subjected to guardianship and surveillance, with the intent

-140-

to interfere with Plaintiff's rights of privacy, association and enjoyment of property, with Plaintiff's right to contract and with her prospective economic advantages, while the violation of her right to full employment and to pursue her profession was furthered beyond all boundaries of common decency for the purpose of compelling her into financial hardship and to appropriate her property acting through Ana Messer's guardian.

48. The tortious acts committed by Defendants Castro and by the arbitrator of the Popular Tribunal, acting within the scope of his employment, were premeditated and calculated to deny to Plaintiff the right to free justice and open courts to seek remedies for the intentional, deliberate and willful deprivation of her rights, privileges and immunities secured under the laws and the Constitution of the United States instigated and perpetrated in pursuance of Defendants John Does I and Castro's joint venture to inflict cruel and unusual punishment to Alfred Messer's Cuban female descendants, and to punish the Plaintiff for her having left Cuba. The Guantanamo exodus that took place in July 1994, when Plaintiff's cases were pending before the United States Court of Appeals for the Eleventh Circuit was authorized and instigated by Defendant Castro in pursuance of the conspiracy to prevent Defendant Clinton, by force, intimidation and threats, from discharging the duties of his office to protect and defend the Constitution of the United States securing to Plaintiff a free exercise of her right under U.S. Constitutional Amendment 1 to petition the courts for redress of her grievances against Dade Officials and Reno (See Count VII).

49. Defendant Carter, whose defeat in the Presidential election of 1980, was directly influenced by the Mariel exodus intentionally instigated by Defendant Castro, and Defendant Reno, whose appointment for State Attorney for the Eleventh Judicial Circuit of Florida was procured by Defendants Carter, John Does I and John Does III in return for Reno's promise to misuse and abuse the power of her office in furtherance of John Does I and Castro's conspiracy to prevent the termination of Ana Messer's legal guardianship and surveillance, and to hinder Plaintiff's professional advancement, corruptly influenced Defendant Clinton to act in furtherance of the conspiracy to inflict on Plaintiff cruel and unusual punishment for being a female of the family that Alfred Messer created with his Cuban wife.

50. Influenced by Defendants Castro, John Does I, Carter and Reno, by the threat that the negative impact that the Guantanamo exodus could have upon his re-election, Defendant Clinton passed Title 50 U.S.C. §§1821, et seq., and Executive Order No. 12949 vesting Defendant Reno with authority to make Plaintiff's premises the target of video surveillance, activity in which Defendant Reno was embarked since at least November 1993, in conjunction with other unlawful activities, including the tortious interference with Plaintiff's right to freely sell her real property with the intent to compel a judicial sale through a fraudulent court proceeding that was a shame, the arbitrary appointment of a legal guardian for Plaintiff's person and property without even informing Plaintiff when was she adjudicated incompetent, the wrongful disbursement of every penny

in possession of the court after the sale of Plaintiff's property
by concept of surplus and insurance proceeds, the unlawful arrest
of the Plaintiff when she was unable to pay the rent to the
landlord, and her wrongful expulsion without compliance with
Florida Statutes to evict a tenant, causing that she had to sleep
in her car and subsequently in the streets when her car broke
down, while a guardian, unknown to the Plaintiff, appropriated
$25,000 of Plaintiff's money in pursuance of Defendants Castro
and John Does I's joint venture to condemn Plaintiff to misery,
ignominy, disgrace, humiliation, and to inflict on her severe
mental and emotional pain and suffering for the purpose of
punishing her for being a Cuban female descendant of Alfred
Messer, and for her having left Cuba.

51. Plaintiff is now a citizen of the United States, but was
an alien when Defendants Cuba, Castro and the Popular Tribunal
committed the tortious acts in vilation of the laws of nations or
a treaty of the United States. Alien's Tort Statute, Title 28
U.S.C. §1350, provides not merely jurisdiction, but also cause of
action, with federal cause of action arising by recognition of
international torts through the statute. Defendants Cuba,
Castro and the Popular Tribunal's tortious acts raise to the
level of international significance and involve well established
universally recognized norms of international law as to permit
the exercise of federal jurisdiction under Title 28 U.S.C. §1350.

52. Articles 55 and 56 of the United Nations Charter create
obligations on the member nations and the United Nations itself,
but they do not create rights enforceable by private litigants in

American courts. Although not self-executing, United Nations Charter's human rights provisions, including Articles 55 and 56, are evidence of principles of customary international law in connection with jurisdictional argument based on 28 U.S.C. §1350. One of the exceptions to a blanket rejection of Articles 55 and 56 as sources of privately enforceable rights, involve arguments prohibiting racial or sexual discrimination in connection with the sale or ownership of property in the United States.

53. Sovereign immunity is an affirmative defense that must be specifically pleaded, the burden remaining on the foreign state to produce evidence in support of its claim of immunity. The doctrine of sovereign immunity is inherently limited and disallowed in the instant case in which Defendants Cuba, Castro and the Popular Tribunal have acted in clear violation of international law.

54. There is no statute of limitations under international law. Although limitations period of claim under Title 28 U.S.C. §1350 is governed by state law, because the claim itself is a federal claim, federal tolling doctrines apply. Defendants Cuba, Castro and the Popular Tribunal's fraudulent concealment of the truth concerning Plaintiff's very cause of action, and the extraordinary circumstances outside Plaintiff's control caused that Plaintiff remained in ignorance of material facts of her claims without any fault or lack of due diligence of her part. When Plaintiff attended the courts of the United States to seek remedies for the injuries sustained as result of Dade Officials' pattern of employment discrimination and harassment, John Does I,

-144-

Defendant Castro co-conspirators, conspired with the court officers to fraudulently conceal the facts of her claims, as well as the parties involved in the violations making it impossible for Plaintiff to discover material facts of her cause of action and the identity of the tort-feasors. The appointment of a guardian for Ana Messer's person or property, or both, by a court of New York where Ana Messer never resided, evidences the Defendants' intent to fraudulently hide themselves and the facts of Plaintiff's claims. Federal equitable tolling doctrine tolls the running of the statute of limitations until discovery of Defendants' fraud.

55. The statute of limitations has not yet begun to run on Plaintiff's torts claims for unlawful surveillance and fraudulent appointment of a guardian for Plaintiff. Defendants Cuba, Castro, the Popular Tribunal and John Does I's tortious acts in pursuance of a joint venture is a continuing violation of the laws of the United States, of the treaties of the United States and of the laws of nations.

WHEREFORE Plaintiff requests the entry of an order finding Defendants Cuba, Castro and the Popular Tribunal in violation of Title 28 U.S.C. §1350 and awarding Plaintiff $5 million (Five Million Dollars) in damages for compensation for pain and suffering and punitive damages.

COUNT III

CLAIM UNDER 28 U.S.C. §§1330, 1603, 1604, 1605(a)(1),(4) and (5)

AGAINST DEFENDANTS CUBA, POPULAR TRIBUNAL,

CASTRO, ALARCON, ROBAINA AND ROQUE

1.   Under   Title   28   U.S.C.   §1330(a)   this   Court   has
jurisdiction of this action against Defendants Cuba and Popular
Tribunal.   Upon his take over in Cuba on January 1, 1959,
Defendant Castro embarked in a joint venture with John Does I to
deprive Ana Messer of the rights guaranteed to all persons by the
law of nations in furtherance of a vendetta against the family
that   Alfred   Messer   created   with   a   Cuban   wife.   Defendant
Castro's   tortious   acts   and   omissions   were   carefully   designed,
calculated and premeditated to result in the personal injuries
and loss of property suffered by Plaintiff in the United States
in pursuance of a conspiracy to subject Alfred Messer's female
descendants to cruel and unusual treatment, and to punish the
Plaintiff for her having left Cuba.   Under the Foreign State
Immunity Act, Title 28 U.S.C. §§1605(a)(5), sovereign immunity is
waived in suits for money damages against a foreign state for
personal injury or damage or loss of property occurring in the
United States and caused by the tortious act or omission of that
foreign state or any officer or employee of that foreign state
while acting within the scope of his office or employment.

2.   In pursuance to his joint venture with John Does I to
conceal Arturo and Gloria Ron-Fornes' past, Defendant Castro
arbitrarily   subjected   Ana   Messer   to   the   control   of   a   legal

-146-

guardian in Cuba, and instigated Defendants Ron and Nancy to leave Cuba through the Repatriation Program against their will to prevent the termination of the fraudulent guardianship of Ana Messer in the United States. Defendants Cuba and Castro deliberately implicated United States courts in the persecution of Ana Messer, or at least contemplated the involvement of United States courts in the plan to subject Ana Messer to guardianship in this country, so waiving their immunity explicitly or by implication.

3. Acting at the instigation of Defendant Castro, in furtherance of Defendant Castro's joint venture with John Does I to keep Ana Messer under Ron's control to prevent the Plaintiff from learning of Ana Messer's legal status and the termination of Ana Messer's legal guardianship, Defendants Ron and Nancy willfully acted in furtherance of the scheme carefully designed by Defendant Castro and John Does I to hinder Plaintiff's economic progress and development in the United States. As result of Defendants Cuba, Popular Tribunal and Castro's tortious acts and omissions in furtherance of John Does I's conspiracy, the Plaintiff was deprived of the right to pursue a profession in the United States, was denied employment, was subjected to a humiliating and degrading pattern of sexual harassment and discrimination by reason of her sex and her ethnicity, was deprived of the right to own, enjoy and sell property, to make and enforce contracts without tortious interference with her prospective economic advantages, was arbitrarily deprived of the rights of privacy and association, her personal relations and

-147-

activities were intentionally interfered and disrupted, and she was injured in her person and property for the purpose of punishing her for attending the courts of the United States to seek remedies for the injuries that she was sustaining.

4. In August 1994, when Plaintiff's appeals from the orders entered in Cases Nos. 90-0230 and 92-1569 were pending before the United States Court of Appeals for the Eleventh Circuit, and Defendants John Does I, John Does II, John Does III, Dade Officials, Reno and the CANF were conspiring to prevent Defendant Clinton, by intimidation and threats, from discharging the duties of his office to defend and protect the Constitution of the United States preventing further deprivations of Plaintiff's civil and constitutional rights, and securing to Plaintiff the free exercise of her right to attend the courts under U.S. Constitutional Amendment 1, Defendant Castro conspired with Defendant Alarcon, who was in territory of the United States meeting with United States Officials under Reno's direction and control, to act in pursuance of the conspiracy to intimidate and threaten Defendant Clinton, intentionally, wilfully and deliberately instigating the Guantanamo exodus. The purpose of the Guantanamo exodus was to influence Defendant Clinton, by intimidation and threats, to pass Title 50 U.S.C. §§1821, et seq., and Executive Order 12949, vesting Defendant Reno with authority to make Plaintiff's premises the target of video surveillance with the intent to prevent the Plaintiff from securing a contract for sale on her property.

5. Being physically in territory of the United States, Defendant Alarcon conspired with Defendant Castro and with Officials of Defendant Clinton Administration under Reno's authority and control, to design and execute a scheme to deprive the Plaintiff of the right to attend the courts of the United States to seek remedies for the injuries suffered as result of Reno and Dade Officials' actions in pursuance of Defendants John Does I and Castro's joint venture to deprive the Plaintiff in territory of the United States of the basic human rights and fundamental freedoms guaranteed to all persons by international laws, and of the rights, privileges and immunities secured to all American citizens by the laws and the Constitution of the United States resulting in the personal injuries and loss of property suffered by Plaintiff.

6. Defendants Castro and Alarcon willfully acted in furtherance of the scheme to deprive Plaintiff of the right to the due process and equal protection of the laws in the fraudulent proceeding to foreclose Plaintiff's mortgage before Defendant Barr.  In pursuance of the scheme to injure the Plaintiff in her person and property with the intent to deter or prevent her from attending the courts of the United States, while Defendant Alarcon met with United States Officials under Defendant Reno's authority and control, Defendant Reno conspired with the CANF to intimidate the Cuban exiles with the threat that Defendant Clinton Administration would lift the embargo on Cuba if Plaintiff did not give up her legal claims against Dade Officials and Reno. The simultaneous conference held by

-149-

Defendants Reno in Washington, D.C., and Alarcon in Havana on or about May 3, 1995, was calculated to instigate the waive of demonstrations of the Cuban exiles' in the streets of Miami while Defendants Reno and the CANF conspired with Defendants Farina and Barr to enter an order in Case No. 94-20188 dismissing Plaintiff's counterclaim in reckless disregard of the evidence and the law.

7. In pursuance of the conspiracy to prevent, delay or deter Plaintiff from attending the United States Courts, a collusive judgment of foreclosure was entered in Case No. 94-20188 with the intent to appropriate Plaintiff's real property, to fraudulently subject the Plaintiff to legal guardianship without notice, without a hearing and without the institution of a proceeding for adjudication of competence, to arbitrarily disburse the surplus and insurance proceeds exceeding $24,000 that belonged to the Plaintiff. The Cuban community was instigated to oppose Plaintiff's efforts to attend the United States Courts, and the conspiracy to injure the Plaintiff in her person and property was furthered beyond all boundaries of common decency becoming Plaintiff the victim of arbitrary arrests, home expulsions and home invasions. Plaintiff's personal property was stolen and damaged, and her legal papers unlawfully seized.

8. Meanwhile, Defendants Castro, Alarcon and Robaina, without notice to the Plaintiff, plotted with Defendant Albright to serve as arbitrator in the courts of the United States, in furtherance of the conspiracy to deny to Plaintiff the right to a meaningful, effective and adequate access to the courts.

Defendants Cuba and Popular Tribunal have waived their immunity due to the direct connection between their activities in the United States courts and Plaintiff's claims for relief.   The Defendants' tortious conduct constitutes a deliberate interference with a proceeding in the Courts of the United States and has contributed to the severe emotional and mental pain and suffering, and the personal injuries and loss of property sustained by Plaintiff.

10. Jurisdiction in this action is predicated on 28 U.S.C. §1330(a) which provides that the district courts shall have original jurisdiction without regard to the amount in controversy of any nonjury civil action against a foreign state as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity.   A foreign state includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state like Defendant Popular Tribunal.   In this action brought by Plaintiff, who is not alien, against Defendants Cuba, Popular Tribunal, Castro, Alarcon, Robaina and Roque, all aliens, Plaintiff also alleges diversity of citizenship pursuant to Title 28 U.S.C. §1332 as basis for jurisdiction.

11. Sovereign immunity is waived in this suit under the Foreign State Immunity Act, Title 28 U.S.C. §1605(a)(5) for money damages against Defendants Cuba, Popular Tribunal, Castro, Alarcon and Robaina for personal injury or damage or loss of property occurring in the United States and caused by the tortious act or omission of Defendants Cuba and Popular Tribunal

-151-

or Defendants Castro, Alarcon and Robaina acting within the scope of their offices or employment.

12. Additionally, pursuant to Title 28 U.S.C. §§1605(a)(1) Defendants Cuba, Popular Tribunal. Castro, Alarcon and Robaina waived immunity from jurisdiction of the courts of the United States by agreeing to serve as arbitrator in the courts of the United States.

13. This action against Defendants Cuba, Popular Tribunal, Castro, Alarcon and Robaina is timely. The tortious conduct of the Defendants is an ongoing tort that precludes the running of the statute of limitations. Additionally, the Defendants' fraudulent concealment of the facts and circumstances of Plaintiff's cause of action and their involvement in the violations provides further reasons for the Court to refrain from barring Plaintiff's claims and for the Defendants to raise the statute of limitations as defense.

14. This Court has jurisdiction to grant preliminary injunctive relief in the instant case where there is substantial likelihood of Plaintiff prevailing on the merits, substantial threat that Plaintiff would suffer irreparable injury if an injunction is not granted and the balance of harm weigh heavily in Plaintiff's favor. A preliminary injunction restraining Defendants Cuba, Popular Tribunal, Castro, Alarcon, Robaina and Roque from taking part in a foreign action designed to prevent the courts of the United States from making full and complete justice in Plaintiff's case is required to prevent irreparable miscarriage of justice.

-152-

WHEREFORE Plaintiff requests damages to compensate for the personal injuries and property losses caused by the tortious acts and omissions of Defendants Cuba, Popular Tribunal, Castro, Alarcon and Robaina and punitive damages in the amount of $5 million (Five Million Dollars). The Plaintiff moreover requests a preliminary and permanent injunction, and declaratory relief that any decision made by Defendants Castro, Alarcon, Robaina, Roque or any other Official of Defendant Cuba affecting Plaintiff's rights under the laws and the Constitution of the United States be declared void and null, to permit Plaintiff's United States claims to go forward in the courts of the United States free from foreign interference.

Respectfully submitted,

ADA L. RON-MESSER
P.O. Box 6707
Falls Church, VA   22040-6707